CORNELIUS VINKE *et al.*, Plaintiffs-Appellants, *v.* ARTIM TRANS-
PORTATION SYSTEM, INC., Defendant-Appellee.

First District (4th Division)  No. 79-805

Opinion filed August 7, 1980.

John C. Mullen & Associates, of Chicago (Thomas A. Clancy, of counsel), for appellants.

Pretzel, Stouffer, Nolan & Rooney, Chartered, of Chicago (Robert Marc Chemers, of counsel), for appellee.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

A passenger van traveling on the Indiana toll road ran into the rear of a semitrailer truck. Three of the passengers in the van, Jean Vinke, her daughter Elizabeth Vinke, and her niece, Lyn Jozsa, were killed. Another of Jean Vinke's daughters, Mary Lou Vinke, suffered personal injuries. The representatives of the decedents' estates and Mary Lou Vinke are the plaintiffs here. Jean Vinke's son, David Vinke, who was driving the van, was never a plaintiff in the action. The driver of the truck, Donald

Marshall, was named a defendant but was dismissed at the conclusion of the plaintiffs' case and is not a party to this appeal. Artim Transportation System (Artim) was the sole remaining defendant when the case was submitted to the jury.

The jury returned a verdict in favor of Artim and two special interrogatories finding that the driver of the plaintiffs' van was negligent and that his negligence was the sole proximate cause of the accident. On appeal, the plaintiffs argue (1) the jury's finding that the negligence of the driver of the van was the sole proximate cause of the accident was contrary to the manifest weight of the evidence and (2) the court should have allowed their motion for a mistrial in light of its acknowledged personal hostility and prejudice against plaintiffs' counsel. They also allege a number of trial errors which will be detailed subsequently.

The accident occurred on October 8, 1973, about 6:45 or 7 p.m. on the Indiana toll road at the Riverside Drive overpass in the city of Gary, Indiana. The occupants of the van were on their way from Harper, Michigan, to Chicago. Jean Vinke was in the front passenger seat. Elizabeth and Mary Lou Vinke and Lyn Jozsa were asleep in the back of the van.

Marshall, an employee of Artim, was driving his truck tractor with a 30-foot flatbed trailer attached, westbound on the Indiana toll road. He was moving at a speed of five miles per hour in an attempt to pull off the highway onto the shoulder. The truck had run out of gas. Marshall's vehicle was struck in the rear by the Vinke van.

The allegations of negligence on which the jury was instructed were that the defendant (1) operated the truck at a speed below the posted limit, (2) obstructed the roadway, and (3) failed to adequately refuel the truck, which it knew or should have known was likely to run out of fuel.

Marshall testified he entered his vehicle at 5:30 a.m. the day of the accident. He had purchased the truck two weeks earlier. The vehicle had two saddle-type fuel tanks located on each side behind the cab. Each tank had a 63-gallon capacity. On the morning in question Marshall believed he had about 65 gallons of fuel. He determined this by examining the fuel gauge which indicated that the tanks were a little over half full. A leveling device was located between the tanks, and one-half gallon of fuel would remain in each tank if the truck ran out of fuel. Marshall also checked the fuel by looking inside the driver's side tank on the morning of the accident. He did not check the level with a stick.

Marshall said he drove the tractor from his home in Romeoville to the Inland Steel plant, a distance of approximately 54 miles. There he hooked his tractor to a steel trailer which had a coil rack in the center. From Inland, Marshall drove to Ryerson Steel in Elk Grove Village, a distance of approximately 30 miles. At Ryerson the engine idled for 30 minutes

while Marshall waited to unload. He shut off the engine while he waited for another 30 minutes. Marshall then drove one-half block to pick up another load of steel coils at Prefinished Metals in Elk Grove. From there he drove about 45 miles to Enamel Products in Portage, Indiana. He arrived in Portage about 2:30 p.m. He shut the engine off for approximately 30 minutes. The trailer was unloaded by 6:15 p.m. At 6:30 p.m. after the engine had been off for another 30 minutes, Marshall checked the driver's side fuel tank and observed over one-quarter of a tank of fuel. The fuel gauge also showed about one-quarter tank. He did not check the tanks with a stick. Marshall said he had previously operated the truck with less than one-eighth of a tank. The witness admitted that in an earlier deposition he said he had only one-eighth of a tank when he was at Portage.

From Portage, Marshall drove a distance of 12 miles to the toll road. He did not pass any stations selling diesel fuel on the way. An alternate route which he sometimes used did have stations along the way. He traveled three miles from the point he entered the toll road to the scene of the accident.

The accident occurred near an overpass or bridge in the westbound lanes. The posted minimum speed limit was 45 miles per hour. Marshall entered the bridge area at a speed of 50 to 60 miles per hour. He accelerated to a top speed of 65 miles per hour. He was traveling at 50 miles per hour in the right lane when he reached the crest of the bridge, which was one mile long with a four-foot wide shoulder. As he reached the crest of the bridge his engine began to cut out and he began to lose power. When he tried to accelerate the truck responded sluggishly. He turned on the emergency flashers which activated flashing lights on both the tractor and the trailer. He also checked the fuel gauge which registered a little under a quarter tank.

As Marshall approached the bottom of the overpass he put on his brakes to prepare for turning off onto the shoulder. He reduced his speed from 45 miles per hour to about 15 miles per hour when he was 250 or 300 feet from the end of the overpass and he braked again at the very end of the overpass and slowed to five miles per hour. Approximately six vehicles passed him by moving from behind his truck into the other westbound lane.

Marshall testified the gas gauge was working properly before the accident. He purchased the truck used two weeks before the accident, and it had 250,000 miles on it. On the date of the accident he had been an employee of Artim for one week. Artim inspected the vehicle before hiring him. The day after the accident Marshall put five gallons of fuel into the truck. The truck then ran properly. Marshall put in another 25 gallons and the gas gauge continued to read under one-quarter. He

thought something was malfunctioning and so he removed the sending unit from the tank and installed a new one. Marshall said his truck consumed fuel at four to six miles per gallon. He estimated his fuel consumption at four to five miles per gallon on the day of the accident based on the load he was hauling.

David Vinke testified that he was a student. He was almost 17 years old at the time of the accident. At the time of the impact he had been driving in the right hand westbound lane of the toll road for about 15 minutes. He was traveling at 70 miles per hour. Vinke testified that he was "glancing down at my speedometer and I heard a scream from my mother sitting to the right of me. I looked up and I observed this semi-trailer truck and braked and swerved at that time and the collision took place." Vinke also said he was familiar with the road and with the van he was driving. He said it was "dusk" at the time of the accident and it was clear and dry. Visibility was excellent; he could see one mile down the road.

Vinke also testified that the bridge was one mile long. It had a four foot wide shoulder and there was no room to pull off a disabled vehicle. At the end of the bridge the shoulder became wide enough for a truck. Traffic was light that day and there was nothing happening in the van to distract him. His mother was reading with light from the dome light and from outside. He believed his headlights were on. Vinke said he could see across the entire length of the overpass from the east end of the bridge. He said it was not difficult to see or to visualize the speedometer in the van. From the time he reached the midpoint of the bridge until his mother screamed he never saw the truck ahead of him. When his mother screamed he looked up and saw the lights on the trailer. He was about 30 feet from the rear of the trailer at that time and was still traveling at 65 to 70 miles per hour. His foot was still on the accelerator.

Carl Prince, a civil investigator, testified for the plaintiffs. He said he clocked the distance traveled by Marshall using the odometer in his own car. The distance from Inland Steel to Ryerson is 59.8 miles; from Ryerson to Portage, Indiana, is 69.8 miles; and from Portage to the scene of the accident is 12 miles. According to Prince, Marshall drove 196 miles that day.

Bruce Moore, a truck salesman since 1950, testified for the plaintiffs. He stated that a 1968 GMC cab-over, like Marshall's, has a fuel consumption of about six gallons per hour at idle. Moore examined the gas gauge, called a gas receiving unit, in a truck of the same model as Marshall's. He described how it operates.

James Wood, a Gary, Indiana, policeman, testified for the defense. He observed the accident in question while he was traveling eastbound in his squad car on the service road which parallels the toll road. He noticed

the van and the truck about five seconds before the impact. The truck had its lights flashing. It was moving at about 15 miles per hour and the van was about 150 to 200 feet behind it moving at 65 or 70 miles per hour. There were no other westbound vehicles. Wood did not notice the van swerve. He saw no skid marks after the collision. About 15 minutes after the accident Wood heard David Vinke say "I looked down at the speed, when I looked back up it was too late to stop."

John Sheehan, a consulting engineer with degrees in metallurgical engineering, testified for the defense. He is not licensed or registered as a metallurgical engineer. He examined the sending mechanism which had been removed from Marshall's truck. He said the pin which in the original design held the float to its support was missing and that the mechanism had been repaired by holding the two parts together with solder instead of another pin. Solder is inherently weak. A vibration will cause it to lose contact with the base metal and it tends to peel away or crack away from the original joint. If broken, the gauge would read anywhere between empty and what it read at the time of the break.

The jury returned a verdict in favor of Artim and against all the plaintiffs. They also answered the following special interrogatories in the affirmative:

"Do you find that, at and just before the occurrence in question, David Vinke was negligent?"

If the answer to the above is in the affirmative, do you further find that such negligence on the part of David Vinke was the sole and proximate cause of the occurrence and of the plaintiffs' injuries and damages?"

Judgment was entered on the verdict and the plaintiffs' post-trial motion was denied.

The plaintiffs' first argument on appeal is that the jury's finding that David Vinke's negligence was the sole proximate cause of the accident is contrary to the manifest weight of the evidence because, they contend, the evidence demonstrated that Marshall was unquestionably negligent and that Marshall's negligence was a proximate cause of the occurrence. In arguing that Marshall was negligent, the plaintiffs contend the evidence showed that Marshall either realized or should have realized that his truck was virtually out of fuel when he drove onto the expressway. The plaintiffs point out that Marshall estimated he had 65 gallons of gas when he started from home that morning and that he drove almost 200 miles. At four miles per gallon he would have used 50 gallons of fuel and at five miles per gallon, he would use about 40 gallons. In addition to the time spent driving, the truck consumed another six gallons per hour, according to Moore, while idling. They also point out the discrepancy between Marshall's testimony at trial, where he said his 6 p.m. visual check of the

tanks showed he had just over one-quarter tank and his earlier deposition where he said he had about one-eighth of a tank remaining at that time. The plaintiffs contend that the broken fuel gauge does not excuse Marshall's negligence and that he "must have driven for close to half the day and never noticed that his gauge was not declining any more" from the quarter tank point.

■■ Negligence is defined as the failure to do something which a reasonably careful person would do, or doing something which a reasonably careful person would not do. (*Haymes v. Catholic Bishop* (1968), 41 Ill. 2d 336, 243 N.E.2d 203.) The jury was instructed of this principle by means of Illinois Pattern Jury Instructions, Civil, No. 10.01 (2d ed. 1971), which states:

> "When I use the word 'negligence' in these instructions, I mean the failure to something which a reasonably careful person would do or the doing of something which a reasonably careful person would not do, under circumstances similar to those shown by the evidence. The law does not say how a reasonably careful person would act under those circumstances. That is for you to decide."

Marshall testified that he had purchased his truck only two weeks prior to the day of the accident. He said the gas gauge was working properly before the accident. On the morning in question Marshall checked the fuel level by looking at the gauge and also by looking into one of the tanks. Both showed that he had a little more than half a tank of fuel, or about 65 gallons. At 6:30 p.m. in Portage, Marshall checked the fuel tank again and observed over one-quarter of a tank of fuel. The gauge showed the same quantity. From that time until Marshall ran out of fuel he traveled only another 15 miles.

■■ From this evidence the jury had a right to conclude that Marshall was not negligent; that he had neither failed to do something which a reasonably careful person would do nor done something which a reasonably careful person would not do. The jury could find that Marshall acted in a reasonably careful manner in checking his fuel and that he was not negligent in failing to determine that he would run out of gas on the expressway.

The plaintiffs next argue the trial court should have granted their motion for a mistrial in light of its acknowledged personal hostility and prejudice against their attorney. Additional facts must be related in connection with this argument.

On the morning of the third day of trial, following *voir dire* and the testimony of the first two witnesses for the plaintiffs, plaintiffs' counsel, John Mullen, asked for a conference outside the presence of the jury. He told the court that on two occasions the defendant's attorney had been seen conferring with the trial judge *ex parte* and that those conferences

gave the appearance of impropriety. The trial judge and defense counsel acknowledged having been together in chambers but denied there had been any discussion of the case outside the presence of plaintiff's counsel. Plaintiffs' counsel then asked to be allowed to cross-examine defense counsel under oath or to be granted a mistrial. The court denied the motion.

Following the testimony of the next witness, counsel for both sides again met with the judge outside the presence of the jury. The judge said that at 2 p.m. on November 15 the case had been sent to him for trial and that defendant's counsel came into chambers to ask if the court was ready. On the 16 and 17 of November the defendant's attorney also reported to the trial judge in chambers when he was ready to proceed. The judge called the courtroom clerk and his personal deputy to testify. Each said they were present when defense counsel came into chambers to report the case ready for trial and that the door to chambers remained open. The judge instructed all counsel not to enter his chambers during the balance of the trial. The judge told plaintiffs' counsel that during his 18 years on the bench he had "never had such evil thoughts suggested to me by any lawyer" and that "lawyers should not make unfounded accusations against judges * * * ."

Plaintiffs' counsel asked to cross-examine the two courtroom personnel. The court refused, saying it had examined the two people "to ease your apparently diseased evil mind that some conspiracy was going on." The colloquy continued in this fashion and plaintiffs' counsel asked for a mistrial. The court denied the motion, saying one could not get a mistrial because of his own misconduct.

After the jury's verdict and as part of their post-trial motion, plaintiffs' counsel and his associate filed affidavits. The associate's affidavit stated that he observed defense counsel in the judge's chambers and that the defense attorney was "arguing the loan agreement." The affidavit of plaintiffs' counsel stated that he saw defense counsel conferring with the judge in chambers and that he heard defense counsel say the words "which these cases hold * * * ." The defendant's attorney also filed an affidavit in which he denied having any conversations with the judge pertaining to any aspect of the case then on trial. It said he would occasionally report to the judge in chambers that he was present and ready to proceed with the trial.

■■ When plaintiffs' counsel brought to the court's attention his concern about the *ex parte* communications between the judge and defense counsel, the judge and defense counsel each stated unequivocally that there had been no discussion of the case on trial outside of the presence of plaintiffs' counsel. This should have put the matter to rest, but plaintiffs' counsel instead chose to pursue the matter and provoked some harsh

statements from the trial judge. There is no suggestion from the record that the jury was aware of or affected by this dispute. The "loan agreement" referred to in the associate's affidavit is not an issue on appeal. It was never mentioned in the briefs except as a quote from the affidavit in question. The statement "these cases hold" tells us nothing about what was actually being discussed. In light of the statements by the court and defense counsel that there had been no discussion of the case outside of the presence of plaintiffs' counsel, a motion for a mistrial on the basis of the appearance of impropriety was unwarranted.

The plaintiffs next argue the jury should not have been told that Cornelius Vinke, who was suing for damages for the death of his wife, had remarried. Prior to trial a motion *in limine* was submitted by the plaintiffs to prevent any testimony concerning or reference to the fact of the remarriage of Cornelius Vinke. The court denied the motion, relying on *Watson v. Fischbach* (1973), 54 Ill. 2d 498, 301 N.E.2d 303, where the court held a plaintiff widow's remarriage should be disclosed to the jury so as not to condone perjury. During *voire dire* the trial judge informed the jurors that Cornelius Vinke's deceased wife's name was Jean and that

> "Cornelius Vinke later remarried to a person by the name of Mildred. Now, this fact is purely for identification and the fact that Cornelius Vinke has a new spouse is not to be considered by you in any way on the issue of liability or damages, but I want to tell you that so if you know anyone by the name of Mildred Vinke or Mrs. Cornelius Vinke, you can let us know."

The *Watson* court concluded:

> "[T]he plaintiff's right to a trial free from factors irrelevant to the issues of liability and damages is adequately assured by the fact that the judge will in his initial identification of the parties state the fact of remarriage, identify the new spouse and advise the prospective jurors that the plaintiff's remarriage is not to be considered by them on the issues of liability or damages. A similar instruction, if requested by plaintiff, will be given at the close of the case as a part of the written instructions." (54 Ill. 2d 498, 503, 301 N.E.2d 303, 306.)

The plaintiffs contend the jurors will not understand "the legal and logical basis for permitting what to them may well seem a double recovery" and urge this court to reexamine the *Watson* rule. Alternatively, they contend this case is distinguishable because the plaintiff here was a man while in *Watson* the plaintiff was a woman who changed names upon her remarriage. They submit that where the plaintiff is the husband and undergoes no name change it should be sufficient under *Watson* to inform the jury of the maiden name and married name of the new wife without revealing or concealing the fact of the plaintiff's remarriage.

▮▮ We decline the invitation to reexamine the *Watson* rule. This court is bound by the decisions of the Illinois Supreme Court. (*Mentesana v. LaFranco* (1979), 73 Ill. App. 3d 204, 391 N.E.2d 416.) Neither are we convinced by the argument that this situation is distinguishable from that presented in *Watson* by virtue of the difference in gender of the respective plaintiffs. The *Watson* opinion did not limit its holding to cases where the plaintiff is a woman and has changed her name upon remarriage. It held "prospective jurors may be told by the judge that *a plaintiff* has remarried." (Emphasis added.) (54 Ill. 2d 498, 503, 301 N.E.2d 303, 306.) *Watson* is directed at allowing the parties to have a reasonable opportunity to determine that the jury is free from "influence-producing relationships" (54 Ill. 2d 498, 501, 301 N.E.2d 303, 305) which could exist if a juror is acquainted with the new spouse. The trial court in the instant cause followed precisely the guidelines set forth in *Watson*: it stated the fact of Cornelius Vinke's remarriage, identified the new spouse, and advised the prospective jurors that the remarriage was not to be considered on the issues of liability or damages. For these reasons we conclude the trial court acted properly in advising the jurors of the fact of Cornelius Vinke's remarriage.

The plaintiffs next argue the court erred in overruling their objections to a motion picture film of the accident scene which they contend gave a false impression of the visibility and circumstances at the time of the accident.

Sheehan, the engineer who testified for the defendant, was permitted to show the jury films which he took of the approach to the accident scene. Sheehan and a photographer drove along the overpass to the scene of the accident, traveling at 68 miles per hour in a Dodge van, while making both still and moving picture photographs. They placed bright orange colored cones and flags along the side of the road to establish distances. Sheehan testified that the flag placed 200 feet from the end of the bridge showed the last place at which evasive action could have been taken by the driver of the van to avoid hitting the semitrailer truck. The films were taken at approximately 3 p.m. on an overcast day. The jury was advised not to consider the movie as a re-creation of the conditions of the incident.

The plaintiffs argue the movie distorted the scene and created a misimpression favorable to the defendant and prejudicial to the plaintiffs. They object to the fact that the accident occurred at 7 in the evening while the film was made in the middle of the afternoon. They also object to the flags and cones which were placed along the side of the road during the filming. They suggest these markers gave the jury a misleading impression of the ease with which distance could be estimated by an actual driver on the road.

The admissibility of demonstrative evidence is a matter within the trial court's discretion, and a court's ruling in this area will not be reversed in the absence of a clear showing of abuse. (*Becker v. Aquaslide 'n' Dive Corp.* (1975), 35 Ill. App. 3d 479, 341 N.E.2d 369.) The Illinois Supreme Court has written

> "[T]he fact that photographic evidence portrays something under conditions not precisely the same as those at the time of the occurrence does not necessarily render it inadmissible, so long as the jury is not misled. [Citations.] Here the jury was admonished not to consider the movie as a re-creation of the conditions of the incident * * *." *Saldana v. Wirtz Cartage Co.* (1978), 74 Ill. 2d 379, 391, 385 N.E.2d 664, 669-70.

Here the movie was taken along the same stretch of road where the accident occurred. The film was shot from a van with the driver seated 6 to 7 feet above the ground as was the case at the time of the accident. Although the film was made in mid-afternoon while the accident occurred at "dusk," about 7 p.m., it was overcast on the day the film was made. We believe it was within the trial court's discretion to determine that the time difference was not such as would mislead the jury. We similarly do not find convincing the plaintiffs' objections to the markers and flags used in the film. In our opinion the markers and flags probably helped to give the jury a sense of the sequence of events preceding the accident. Finally, we note that as in *Saldana*, the jury here was advised not to consider the movie as a re-creation of the conditions of the incident. There was no abuse of discretion in allowing the movie to be shown to the jury.

The plaintiffs next argue the trial court erred in sustaining objections to proper and important questions which they sought to ask their own witness on direct examination. Specifically, the plaintiffs argue the court erred in sustaining the defendant's objection to a question posed by the plaintiffs on redirect to their witness Moore. On direct, Moore testified as to the fuel consumption on the type of truck involved in the accident. On cross-examination he was asked about the fuel sending mechanism of such a truck. On redirect, Moore said he had often checked the fuel level of a truck by inserting a stick in the fuel tanks. He also agreed that it was "more traditional" to use the fuel gauge rather than a stick to determine the fuel level. On redirect plaintiffs' counsel asked Moore, "Could you tell us on a visual inspection of the fuel, what's the custom and practice in the industry for truck driving when trying to determine fuel visually." An objection to this question was sustained, as was an objection on grounds of lack of foundation to a rephrasing of the question. The plaintiffs contend the questions were proper in that they were attempting to inquire into an area which the defendant himself had raised and concerning

which the defense had already asked specific questions. They say both relevance and foundation had been established.

■■ Plaintiffs' counsel made no offer of proof as to what Moore would say if allowed to answer the question. An offer of proof is necessary to preserve a question for review where the trial court refuses to allow the testimony of a witness as to a certain matter. (*Simon v. Plotkin* (1977), 50 Ill. App. 3d 603, 365 N.E.2d 1022.) This issue was thus waived.

The plaintiffs next argue the trial court erroneously permitted the defense to cross-examine both Moore and Cornelius Vinke beyond the scope of the direct examination. The plaintiffs contend their direct examination of Moore was limited to the two subjects of the gas mileage of the truck-tractor in question and the workings of the interior dome light in a Ford van. According to the plaintiffs, the defendant's cross-examination of Moore did not touch on these subjects and instead concerned an inspection of one particular truck and its gas gauge.

■■ The scope of cross-examination of a witness is a matter within the discretion of the trial judge. (*Sweeney v. Max A. R. Matthews & Co.* (1970), 46 Ill. 2d 64, 264 N.E.2d 170.) On direct examination Moore testified concerning the fuel consumption of a 1968 GMC diesel engine tractor. He did not indicate whether he had examined the particular truck which was involved in the accident. We believe it was proper for the defense to inquire as to whether the witness' opinion was based on that model truck generally or rather whether the witness had examined the actual truck with which the plaintiffs' van had collided. When the witness indicated he had inspected the defendant's truck, it was proper for the defense to ask questions concerning the extent and nature of this inspection as this had a direct bearing on the foundation for the witness' opinions and his credibility as an expert on the subject at hand. We thus conclude it was well within the trial court's discretion to permit the questions asked of Moore on cross-examination.

The plaintiffs argue the scope of cross-examination of Cornelius Vinke was also impermissibly broad. In particular, they contend three areas were inquired into on cross-examination which had not been brought out on direct examination: (1) how or why David Vinke renounced his heirship; (2) whether David Vinke would be a witness; and (3) housework done by the family.

Each of the subjects was brought up by the plaintiffs on direct examination. On direct, Cornelius Vinke was asked whether any of the next of kin had renounced or waived their right to any sharing of the proceeds of any possible recovery. He was also asked whether he had, at the request of his counsel, asked David Vinke to be present in court. Finally, during direct examination, in response to a question concerning

how much time his deceased wife spent on housework, Cornelius Vinke volunteered the fact that "well, being in her shoes after she left, I know it took a lot of time to keep house and get groceries." The questions to which the plaintiffs object on appeal were within proper areas of cross-examination.

The plaintiffs next argue it was error for the trial court to make derogatory comments on the efforts of plaintiffs' counsel in the presence of the jury. More specifically, the plaintiffs object to the following comment which was made by the trial judge during the examination of Marshall:

> "Counsel, the man has gone to Inland Steel, he's gone to Portage. We are not worried about anything he did on those trips. That's immaterial to this. He drove from Portage to Chicago; that's the thing we are interested in now. And we went over and broke your tail all morning on his trips and routes and trips so let's go on to something else."

The plaintiffs interpret this comment as "the court [telling] the jury that it respected neither plaintiffs' case nor plaintiffs' counsel." They contend the judge's comment constitutes prejudicial error.

■■ Wide latitude must be allowed a trial judge in conducting a trial, and only where his conduct or remarks are of the sort that would ordinarily create prejudice in the minds of the jurors is reversible error present. (*Clamage v. Shapiro* (1977), 48 Ill. App. 3d 90, 365 N.E.2d 471.) We cannot agree with the plaintiffs' interpretation of the above-quoted statement. Preceding the judge's remark the plaintiffs' counsel was cross-examining Marshall concerning whether he took the shortest route to work the morning of the accident. Marshall said he did not know if the route he took was the shortest one. Plaintiffs' counsel then showed him a map and continued to question him about the route he had taken that morning. Defense objections were sustained on the basis of repetition. The judge's remarks merely pointed out the repetitious nature of the questions and urged the attorney to move to a different area of questioning. We cannot say his comment constituted an abuse of discretion.

The plaintiffs next argue defense counsel "indulged in a pattern of overreaching suggestion" during *voir dire*, examination of witnesses and closing argument. They contend the defendant's attorney implied on numerous instances that the plaintiffs were not honest with the jury. Specifically, the incidents complained of are (1) disclosure of the fact of Cornelius Vinke's remarriage, (2) cross-examination which was beyond the scope of direct, (3) defense counsel telling the jury that the case was going to trial because it had not been settled, (4) defense counsel

suggesting that plaintiffs' counsel was trying to hide the Indiana police officer from the jury, and (5) misstatements of the plaintiffs' burden of proof during closing argument.

■■ The first and second points have been previously disposed of and we will not address them again. In connection with the third point, plaintiffs argue the statement to the jury that the case had not been settled implied that the defendant had been willing to compromise but that the plaintiffs had been unreasonable. We cannot agree that such an inference necessarily or even probably followed from such a statement.

■■ Concerning the Indiana police officer, the plaintiffs argue that when defense counsel asked this witness whether he had received a subpoena from the plaintiffs the question implied that the plaintiffs were trying to "hide" the witness from the jury. No objection was offered when the disputed question was asked. The point is therefore waived. *Saunders v. Norfolk & Western Ry. Co.* (1977), 54 Ill. App. 3d 307, 369 N.E.2d 518.

The plaintiffs' final point in this argument is that the defendant's counsel so seriously misstated the law in his closing argument that a new trial is required. The plaintiffs contend the defense led the jury to believe that the plaintiffs had to prove both David and Jean Vinke were free from any negligence. The plaintiffs point out that David Vinke's negligence was no bar to the recovery of any plaintiff and that the plaintiffs had to prove only that Marshall was guilty of negligence proximately causing the accident. The first statement made by the defendant's counsel which the plaintiffs object to is as follows:

> "What does the plaintiff have to prove in order to undertake that burden and persuade you that he had successfully met it? He has to prove that David Vinke and Jean Vinke were, themselves, not guilty of any negligence. The plaintiffs has [*sic*] to prove that."

The plaintiffs' counsel objected to this, and the trial judge's response was that he would be instructing the jury as to the law. Although we agree that this was a misstatement because it was not necessary for the plaintiffs to prove that David Vinke was free from negligence, we cannot say it amounts to reversible error. The jury was properly instructed as to the law. The statement concerning Jean Vinke was accurate.

The plaintiffs also object to defense counsel's statement during closing that "Mr. Mullen [plaintiffs' counsel] now attempts to forgive him [David Vinke] as he must in order to recover." This was not a misstatement of the law; it does not purport to convey a legal principle. We find the statement unobjectionable.

Finally, the plaintiffs object to the statement that "[Plaintiffs' attorney] has to convince you that Marshall knowingly ran out of fuel in

order to recover." We agree that this was error but believe it does not require reversal because the jury was properly instructed.

The plaintiffs' final argument is that the court erred in refusing their request that the jury be given the following instruction:

> "The plaintiffs * * * claim that they were injured and sustained damage and that the defendant was negligent in one or more of the following respects:
>
> * * *
>
> Carelessly and negligently failed to adequately inspect and maintain its vehicle."

The plaintiffs argue there was ample evidence from which the jury could have found that Artim was under an obligation to perform, and did perform, an inspection of the truck which had 250,000 miles on it, that such an inspection should and reasonably could include removal and examination of the fuel gauge sending mechanism, that the missing pin and "big glob of soft solder" holding together this part should and reasonably could have been discovered, and that discovery would reasonably have required replacement or proper repair of that part.

The only evidence in the record concerning Artim's inspection and maintenance of the truck is found in Marshall's comment that Artim inspected the vehicle before hiring him and the testimony of Sheehan, an engineer, who described the previous improper repair of the fuel sending mechanism.

To justify the giving of an instruction there must be some evidence in the record to support the theory set out in the proposed instruction. (*Malavolti v. Meridian Trucking Co., Inc.* (1979), 69 Ill. App. 3d 336, 387 N.E.2d 426.) The record is totally devoid of any evidence supporting the theory that Artim was under a duty to inspect the vehicle, the nature of the inspection that was performed by Artim and whether it did or should have included perusal of the fuel sending assembly, and whether an inspection of the mechanism should have caused a reasonable person to conclude that the device was inoperable or was so likely to break down that the defendant was obligated to replace it or to order Marshall to do so. In light of the lack of evidence concerning inspections, we cannot say the record contained sufficient evidence to require the giving of the proposed instruction. We thus find no error.

For the foregoing reasons the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

LINN, P. J., and ROMITI, J., concur.