**Maria Santiago, Plaintiff-Appellant, v. Package Machinery Company, a Corporation, Defendant-Appellee.**

Gen. No. 53,063.

First District, Third Division.

April 16, 1970.

Louis G. Davidson, of Chicago (Eugene I. Pavalon and Sidney Robin, of counsel), for appellant.

Gerard E. Grashorn, of Chicago (Edward J. Wendrow, Winston, Strawn, Smith & Patterson, of counsel), for appellee.

MR. JUSTICE SCHWARTZ delivered the opinion of the court.

Plaintiff sues to recover for injuries sustained when the lower part of her right arm was crushed between the

die plates or molds of a plastic injection molding machine built by the defendant. Count I of the complaint charged the defendant with negligence in the design and manufacture of the machine. Count II charged that defendant was strictly liable for plaintiff's injuries in that the machine was defective and unsafe when it left defendant's possession and control. Following the return of a verdict for defendant, a motion for new trial was denied, judgment was entered on the verdict and the plaintiff has appealed. She contends that the trial court erred (1) in admitting certain evidence which it is charged had the effect of wrongfully interjecting an issue as to her employer's negligence, and (2) in admitting testimony in violation of the rule against hearsay as to the practice prevailing in the industry concerning the installation of a safety device on machines of the type here involved. The facts follow.

On November 6, 1961, defendant sold a plastic injection molding machine to plaintiff's employer, Romar Plastic Company. The machine had been designed and manufactured by defendant and was known as Model 175 TA. It was installed on Romar's premises and was ready for operation on December 7, 1961. On August 24, 1964, while operating the machine in the course of her employment, the lower part of plaintiff's right arm was crushed between the die plates of the machine. There are only two die plates in the machine, one of which is movable. When the operating cycle is begun, the movable die plate is brought up flush with the stationary die plate by means of hydraulic pressure. These two plates thus form a completed mold into which heated plastic in a semi-liquid state is pumped. After the plastic cools, the movable die plate automatically returns to its original position, thereby permitting the operator to manually remove the finished parts from the stationary mold. Plaintiff was attempting to do that when the movable die plate unexpectedly closed upon the stationary die

plate, causing the injury for which she now seeks redress.

The machine was equipped with a "safety gate" or shield mounted on two horizontal guide rails by means of four rollers, one positioned at each corner of the gate. The safety gate acted as a physical barrier to the operator so that access to the die plates was impossible once the operational cycle had begun. To operate the machine the plaintiff would grasp the safety gate which was at her left as she faced the machine from the operator's station and draw it across in front of her until it made contact with a stopping block. The gate was now between the operator and the molding area of the machine and was said to be in its "closed" position. In that position access to the die plates was impossible. A beveled projection or cam was mounted at each corner on the bottom edge of the gate. When the gate is in the closed position, each of these projections depress the lever arm of a stationary limit switch which is mounted directly beneath it on the body of the machine. It is only when the safety gate is at the extreme right in the closed position that the limit switches will be simultaneously activated.

The limit switches are designated as follows: when the gate is in the closed position, LS–1 is under the cam on the right corner of the gate and LS–2 is under the cam on the left corner. These switches are wired in series and are the heart of the electrohydraulic interlock safety system. When it is operating properly the lever arms of both limit switches must be simultaneously depressed to complete a circuit that activates a hydraulic pump, thereby causing the movable die plate to close upon its stationary counterpart. The machine was designed so that this could only be accomplished by placing the safety gate in the extreme right or closed position. If either lever arm is depressed independently of the other, the

circuit will not be completed and hence the movable die plate will not be activated.

Limit switches LS–1 and LS–2 are identical in construction. When standing upright and viewed from the front, the movable lever arm of the switch can be mounted in either a two o'clock or ten o'clock position. The switches contain a single movable contact point which will normally come to rest on either of the two stationary contact points, depending on the placement of the return spring. That spring can be mounted on either the right side or "mode" or the left side or "mode" of the limit switch. It is imperative that this spring be mounted in the left mode and that the lever arm be placed in the two o'clock position on both LS–1 and LS–2 for the safety mechanism to be fully effective.

Albert Neumann, a serviceman for the defendant, testified that the day after plaintiff was injured he went to Romar's plant and inspected the machine in question. He noticed that the bottom roller on the right side of the safety gate was missing and that the roller on the upper right corner of the gate no longer engaged its guide rail, thereby permitting the right side of the gate to hang down about six inches lower than normal. He also observed that the return spring in limit switch LS–1 was in the right side or "mode" of the switch, instead of the required left side and that the lever arm of the switch was in the eleven o'clock position, rather than the prescribed two o'clock position. When a limit switch is assembled in that fashion it cannot serve the safety purpose for which it was intended. Neumann testified that limit switch LS–2 was assembled correctly and operating properly. Due to the improper assembly of limit switch LS–1, he was able to activate the movable die plate by manually depressing the lever arm of limit switch LS–2, even though the safety gate was open. He testified further that limit switch LS–1 was a replace-

ment switch which was not a part of the machine's original equipment and which had evidently been installed by some unknown person. He reached that conclusion when he noticed it was painted gray, whereas the rest of the machine, including LS–2, was painted green. While he was at the plant he mounted the safety gate and reassembled limit switch LS–1 in accordance with defendant's specifications.

It is undisputed that the machine was not equipped with a safety device known in the industry as an "interference bar." That device consisted of a flat steel bar which acted as a physical barrier to the movable die plate while it was in the open position, thereby preventing it from beginning another operational cycle until removed from its path. That mechanism was mechanical in operation and did not depend upon either an hydraulic system or an electric circuit for it to function. Such an interference bar could be installed on a plastic injection molding machine in addition to any electrohydraulic safety mechanism already a part of the machine, but it would perform its safety function only in those situations in which there had been a failure in the electrohydraulic system. As such, its function is supportive or secondary to the electrohydraulic system. We proceed to a consideration of plaintiff's points.

Plaintiff contends that the trial court erred in admitting evidence which in her words "allowed the defendant to interject the negligence of the plaintiff's employer as a defense." Three occasions on which such evidence is said to have been erroneously admitted are cited in the record. In support of her contention the plaintiff relies on Rylander v. Chicago Short Line Ry., 17 Ill2d 618, 161 NE2d 812; Hulke v. International Mfg. Co., 14 Ill App2d 5, 142 NE2d 717; and Romine v. City of Watseka, 341 Ill App 370, 91 NE2d 76. Defendant, on the other

hand, contends that it is always permissible to admit evidence offered for the purpose of proving that the conduct of another was the *sole* proximate cause of the injury.

In Rylander the plaintiff's injuries were allegedly caused by the defendant railroad's negligence in delivering a defective tank car to the plaintiff's employer. The injury occurred when the plaintiff fell from the car while in the course of his employment. The issue there presented was the effect of the Workmen's Compensation Act upon a common-law action for negligence brought by an employee injured in the course of his employment by someone other than his employer. The court did not consider the admissibility of evidence offered to prove that the *sole* proximate cause of the plaintiff's injuries was the negligence of his employer. Nor did the court discuss the propriety of asserting that defense.

In Hulke the action was based on the negligence of the defendant manufacturer. The plaintiff's employer had made several Workmen's Compensation payments to him for the injuries which were sustained in the course of his employment. One of the issues before the court was the employer's right to reimbursement for payments made pursuant to the Workmen's Compensation Act when a proximate cause of the employee's injuries was the negligence of some other person. The court said that any right to reimbursement existed by reason of the employer's partial subrogation to its employee's cause of action and that such right was barred if the employer's negligence contributed to the injury. The court reasoned that since the negligence of the plaintiff's employer could "in no way affect the liability" of the defendant manufacturer it was a "collateral issue" and therefore not a proper defense to the employee's action. The court did not consider whether the defense would have been

proper in a case in which the defendant asserted that the employer's negligence was the sole proximate cause of the injury.

In Romine the plaintiff, a minor five and one-half years old, brought an action by his guardian for personal injuries sustained when he fell from a truck driven by his father. The court said that in an action brought by a minor under seven years of age, who is therefore legally incapable of being contributorily negligent, the general rule is that the contributory negligence of his parents cannot be imputed to him. One exception to that rule was said to arise when the negligence of the parents is the sole proximate cause of the injury. Nowhere does the court say that evidence offered to prove that the sole proximate cause of the injury was the negligence of another is inadmissible.

■ The instant case was tried on two counts—one charging negligence and the other charging strict liability in tort. If the plaintiff is to prevail, she must prove that her injuries were proximately caused by defendant's negligence. (McInturff v. Chicago Title & Trust Co., 102 Ill App2d 39, 243 NE2d 657) or by a condition of the product which was unreasonably dangerous and in existence at the time it left the defendant's control. Suvada v. White Motor Co., 32 Ill2d 612, 210 NE2d 182; Brandenburg v. Weaver Mfg. Co., 77 Ill App2d 374, 222 NE2d 348. Manifestly, then, the defendant could avoid all liability by proving that the *sole* proximate cause of the injury was the conduct of another. We find no error in the admission of evidence supporting this contention.

■ Plaintiff argues it was error for defense counsel to read in the presence of the jury a paragraph from a book not in evidence. The record shows that while Olmsted, defendant's chief product engineer since 1952, was undergoing redirect examination, defense counsel read from a book entitled, "Plastic Safety Handbook," published in 1959 by the Society of the Plastic Industry in

312

cooperation with the National Safety Council. The witness was asked:

"And are you familiar with the following provision which is in this book, and were you back in '60 and '61:

"'Safety devices of any nature are as good as the maintenance. The operational safety devices should be checked, at least every day, preferably after each hour shift, to make sure they are working properly.' "

Plaintiff's objection to that question was overruled and Olmsted answered, "Yes." Prior to that time plaintiff's attorney had introduced a "data sheet" published by the National Safety Council which was admitted into evidence. Paragraph thirteen of that sheet provides for maintenance of the safety devices in language the meaning of which is indistinguishable from that used by defense counsel. Plaintiff cannot be heard to complain of that evidence since she introduced substantially similar evidence. Powell v. Weld, 410 Ill 198, 101 NE2d 581; Hadie v. Erlandson, 41 Ill App2d 328, 190 NE2d 848.

Plaintiff also contends that the trial court erred in permitting the defendant to cross-examine one of her witnesses regarding several provisions found in an instruction manual for a machine other than the one in question. The record shows that the witness Ronald Swanson, a foreman employed by plaintiff's employer, who was on duty at the time the plaintiff was injured, was asked by defense counsel if he ever read anything in the instruction manuals which accompanied the various machines, recommending daily inspection of the safety gate and its rail guides. Swanson recalled reading that recommendation in the instruction manuals, but he had never made any safety inspections. At that point plaintiff's counsel interposed an objection and requested production of the manual referred to. The ensuing colloquy

revealed that the manual for the defendant's plastic injection molding machine Model 175 T contained the specific recommendations which formed the basis of counsel's questions, whereas the manual for the machine in question in this case (Model 175 TA) recommended daily inspection of the "main assemblies of the safety gate and the safety bar stop arrangement." The only relevant difference in the provisions of the two manuals is that the "assemblies" referred to in the manual for Model 175 TA are named in the manual for Model 175 T. It appears to be an insubstantial difference. Admission of such evidence must rest largely in the discretion of the trial court. We find no error in the court's ruling on this point.

▮ Finally plaintiff argues that Olmsted, defendant's chief product engineer, as hereinbefore noted, was permitted to testify in violation of the hearsay rule, that it was not the industry's practice to install "interference bar" safety devices on plastic injection molding machines prior to 1961, the year the machine in question was sold to plaintiff's employer. The record shows that while testifying on direct examination Olmsted was asked if such a safety device was installed by other manufacturers prior to 1961 and that he responded, "not to my knowledge." On cross-examination he testified that he had personally examined the industry literature dealing with safety equipment which was in use and new types which were available. At a later point in his cross-examination he testified that he had no knowledge of the precise dates when other named manufacturers first began installing such "interference bars" and admitted that the only way he learned of those approximate dates was through the company's servicemen in the field. It is not clear that all of Olmsted's testimony as to the installation of safety bars was based on firsthand knowledge, but in the admission of testimony as to what con-

stitutes general practice in an industry, some latitude must be granted to the trial court. We find no error of substance.

The judgment is accordingly affirmed.

Judgment affirmed.

DEMPSEY, P. J. and McNAMARA, J., concur.