JOHN E. LUNDY, JR., *et al.*, Plaintiffs-Appellees, *v.* WHITING CORPORA-
TION *et al.*, Defendants-Appellants.—(CHICAGO STEEL ERECTORS, INC.,
Defendant and Third-Party Plaintiff, *v.* ALLIED PRODUCTS CORPORATION
*et al.*, Third-Party Defendants.)

First District (2nd Division)     No. 78-2028

Opinion filed February 3, 1981.—Rehearing denied March 10, 1981.

Lord, Bissell & Brook, of Chicago, for appellant Whiting Corporation.

Goldenson, Kiesler, Berman & Brenner, of Chicago, for appellant Chicago Steel Erectors, Inc.

Johnson, Cusack & Bell, Ltd., of Chicago, for appellant Allied Products Corporation.

Robert B. Patterson and Bernard Spak, both of Louis G. Davidson & Associates, Ltd., of Chicago, for appellees John E. Lundy, Jr., and Judith Lundy.

McDermott, Will & Emery, of Chicago, for appellee A. Epstein & Sons.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Plaintiff John Lundy, injured in an industrial accident, brought an action sounding in strict liability in tort against Whiting Corporation (Whiting), and a negligence action against Chicago Steel Erectors, Inc. (CSE). Plaintiff Judith Lundy filed a loss of consortium claim against Whiting and CSE. Whiting is the manufacturer of overhead cranes used by Allied Products Corporation (Allied), plaintiff's employer. CSE erect-

ed a portion of the building in which plaintiff was injured and installed the overhead crane which struck and injured plaintiff. CSE filed a third-party action for indemnity, joining Allied and A. Epstein & Sons, Inc. (Epstein), architects and engineers for the construction of Allied's plant.

■■ At trial, the jury returned verdicts in favor of John Lundy ($700,000) and Judith Lundy ($50,000) against both Whiting and CSE. The jury found in favor of CSE in its action for indemnity from Allied, but found Epstein not liable to CSE. The trial court denied all post-trial motions. After the verdicts were rendered, Allied and CSE each filed a fourth-party complaint against Whiting, seeking indemnity for the amount of the judgment. The trial court dismissed without prejudice both complaints. Whiting and CSE appeal from the verdicts in favor of Lundy; CSE and Allied appeal from the verdicts in the indemnity actions; and CSE and Allied appeal from the dismissal of their fourth-party complaints.[1]

Allied Products Corporation fabricates structural steel members for use in bridges and large buildings. Plaintiff John Lundy was employed at an Allied facility in Chicago Heights, Illinois. This plant was constructed in 1960. The original structure was a long (700 feet), relatively narrow (80 feet wide) building with no interior partitions. The work area was known as the bay. Since Allied's work required the cutting and joining of large pieces of steel, overhead bridge cranes were employed in the plant. One of these cranes was the instrumentality of plaintiff's injury, so it is necessary to describe the machine in some detail.

An overhead bridge crane is designed to carry out lifting operations anywhere in the work area beneath it. The crane is formed by parallel girders that span the width of the bay. The parallel girders that form the bridge are 14 feet apart; the two members that connect the bridge beams at either end, forming a box-like structure, are the end trucks. The two end trucks have flanged steel wheels that ride on rails similar to railroad track. The rails are fixed high on the walls of the bay, so the crane spans the 80-foot width of the bay and can traverse the entire 700-foot length of the bay. Another set of rails is mounted on the top surface of the bridge

---

[1] Allied and CSE have denominated their indemnity complaints against Whiting "fourth party complaints." We note that only Allied's is a true fourth-party action, since, as in *Texaco, Inc. v. McGrew Lumber Co.* (1969), 117 Ill. App. 2d 351, 354, 254 N.E.2d 584, it is the complaint of a third-party indemnitor seeking to shift its liability to a fourth party. Regardless of the labels involved, we find the appeals from the dismissals of these complaints untimely. The trial court dismissed these complaints "without prejudice to filing a separate action for indemnity," and this court has held that a dismissal without prejudice is on its face a nonappealable order. (See *Arnold Schaffner, Inc. v. Goodman* (1979), 73 Ill. App. 3d 729, 731, 392 N.E.2d 375.) The trial court's order contains no language to indicate that the order was to be considered final and appealable under Supreme Court Rule 304(a) (Ill. Rev. Stat. 1979, ch. 110A, par. 304(a)). We therefore dismiss Allied's and CSE's appeals insofar as they pertain to the dismissal of their "fourth party" complaints.

beams, and the trolley, a wheeled platform containing two hook and cable lifting devices, rides on these rails. Since the bridge can travel the length of the bay and the trolley can range over the width of the bridge, the hooks can be positioned anywhere on the floor for lifting operations.

A catwalk is attached to the outside face of one of the bridge beams for maintenance access to some of the crane's machinery. A cab for the crane operator hangs from the underside of the same bridge beam, and a ladder through the roof of the cab gives access to the catwalk. The crane is 30 feet above the floor of the bay, so access to the cab is provided by a platform in the center of the bay wall. The platform is level with the cab, and is reached by a stairway from the floor. Since Allied's operations involve the lifting of large structural members, two cranes are installed on the same set of rails. The cranes can then work together or separately.

As noted above, Allied's original facility in Chicago Heights was a single bay built in 1960. Epstein was the architect for the 1960 construction. Allied purchased two 25-ton capacity cranes from Whiting Corporation, and hired John F. Beasely, a steel erection subcontractor, to erect the building and set the Whiting cranes in place. In 1960, Allied contemplated that more bays might be added in the future, so Epstein designed the concrete footings of the 1960 bay to accommodate columns that would support another bay identical to the first. In 1966, Allied added a second bay, which came to be known as the north bay. Rather than engage Epstein or another architect, Allied simply re-used the 1960 drawings, and had CSE erect a duplicate building and install two more Whiting cranes, identical to the first set. The columns supporting the south side of the new bay were placed alongside the existing columns of the 1960 footings, as anticipated by Epstein.

In the 1960 construction, the crane rail was bolted to beams supporting the exterior walls of the bay. Whiting's specifications for the cranes called for 2 inches minimum clearance between the crane and fixed structural members of the building. Epstein incorporated this specification into its drawings, so that the cranes had 3 or 4 inches clearance as they passed the building's vertical columns. There was about 24 inches clearance between the crane and the corrugated steel exterior walls. In the 1966 construction, the corrugated steel exterior wall on the north side of the bay was removed (the structural steel frame remained), and the rail for the new north bay's cranes was attached to the other side of the beam supporting the original crane rail. The original clearance of 24 inches between the cranes and the wall was reduced to 18 inches clearance between the north bay cranes and the south bay cranes. The beam between the crane rails formed a walkway, but this walkway was obstructed every 20 feet or so by 12-inch vertical columns. Between every other set of upright columns was an "X" cross brace. The cranes had 3 to 4

inches clearance as they passed the columns, and 5 to 6 inches clearance along the "X" brace. The portions of the walkway with no "X" brace (every other interval) had an unobstructed 18-inch clearance between the cranes. Although we refer in this description to a "walkway," the path between the cranes had no handrails or other accommodations for workmen. It was simply a beam 30 feet above the plant floor, and one of the means of access for crane maintenance.

The Whiting cranes were powered by electricity. The moving trolley picked up its electrical power by running a copper "shoe" along uninsulated bridge conductor wires on the inside surface of the bridge beams. Because of the constant wear on these wires, the lines frequently broke, necessitating replacement. Even though Allied had instituted a preventive maintenance program, whereby the conductor wires were repaired every weekend while the cranes were not operating, breaks still occurred two or three times per month. Replacement of a bridge conductor wire was a relatively simple task, occupying two men for about half an hour. Allied's cranes were in constant use, however, so any interruption of crane operations impaired production and idled men on the floor. As a result, crane repairs had high priority at Allied's plant.

Plaintiff was the maintenance electrician for Allied's Chicago Heights plant, and had primary responsibility for maintenance of the cranes. On November 11, 1971, plaintiff received a report that a south bay crane was "down." Plaintiff first looked to see that the cranes in the north bay were not moving. He then climbed up to the walkway alongside the disabled south bay crane. Upon reaching the walkway, he saw the nearest north bay crane still immobile, about 120 feet away. Plaintiff approached the disabled crane, and found that two of his subordinates, Oyenick and Hibbler, had already begun to repair a broken conductor wire. Oyenick was sitting on a brace on the inside surface of the end truck, and Hibbler was on the floor below. The job could be accomplished more quickly with three men, so plaintiff ordered Oyenick to go to the other side of the crane. Plaintiff planned to take Oyenick's place on the end truck. Plaintiff describes his conversation with Oyenick as taking no more than 30 seconds. The disabled crane was stopped at a position where an "X" brace between vertical columns was alongside the end truck. During the conversation, plaintiff was standing on the north side of the brace, that is, facing the brace and looking over it toward Oyenick on the end truck. Plaintiff's back was to the north bay. Just as Oyenick was preparing to move from the end truck and make room for plaintiff, plaintiff saw the north bay crane approaching him, at a distance of less than 10 feet. Concluding that he had too little time to climb through the "X" brace or go around the nearest column, plaintiff pressed himself against the brace. The crane hit plaintiff, dragging him along the brace to the next column.

Plaintiff sustained a severe crushing injury to his back and side. There is no question that plaintiff would not have been injured if he had been standing on the south side of the "X" brace, between the brace and the disabled crane.

The evidence indicated that the Allied plant is very noisy, and that it is difficult to hear an approaching crane. The cranes move at 400 feet per minute (about 4½ miles per hour), a speed described by experts as "very fast" for such large equipment. Allied's cranes were equipped with a manually activated warning siren, but the crane operators at the Allied plant only activated the siren when carrying a load. This practice warned those on the floor who might be endangered by the moving load, but was ineffective for workmen on the walkway who were also endangered by unladen cranes. Whiting supplied a variety of warning devices (bells, sirens, and flashing lights) that were activated automatically whenever the crane moved, but cranes were so equipped only when a customer specifically requested these devices.

After plaintiff's injury, Allied initiated changes in its maintenance procedures. Cranes were always moved to the end of the bay for maintenance, and flashing lights were installed at both ends of the bays. These lights were activated whenever a crane was being worked on, and served to warn the crane operators of workmen on the walkway.

I

Whiting contends that plaintiff has not established the elements necessary for recovery in strict liability in tort, as the evidence did not establish that the crane was defective or unreasonably dangerous when it left Whiting's control. Whiting argues that plaintiff's injury was proximately caused by the installation of the cranes, an installation in which Whiting took no part. Plaintiff maintains that the crane was defective in that Whiting's specifications required only 2 inches clearance at the sides of the crane, a distance too short to ensure safe maintenance access. Even without revising the crane's clearance specifications, Whiting could have ensured safe maintenance access by providing the crane with a platform for conductor repair that was accessible directly from the crane, without approaching from the walkway. Plaintiff also argues that the lack of automatic warning devices rendered the crane unreasonably dangerous.

■■■ The first issue, then, is whether lack of safe maintenance access can be a "defect" for strict liability in tort. This question is not without precedent. In *Sutkowski v. Universal Marion Corp.* (1972), 5 Ill. App. 3d 313, 317, 281 N.E.2d 749, lack of a safe means of ingress and egress made a strip mining machine unreasonably dangerous. Whiting, as manufacturer of the crane, is presumed to be an expert with respect to its product. (*Anderson v. Hyster Co.* (1979), 74 Ill. 2d 364, 368, 385 N.E.2d

690.) Given Whiting's presumed degree of knowledge, it must have known of the frequency of bridge conductor failure, and of the recurring need for the presence of repairmen on the crane. Under these circumstances, the jury could properly find that a machine without a safe means of maintenance access is unreasonably dangerous.

■■■ Although Epstein, Allied, and CSE all played a part in the erection of the building and the installation of the cranes, there was evidence that these parties relied, ultimately, on Whiting's specifications calling for 2 inches minimum clearance. Whiting's witnesses testified that the 2-inch figure referred only to mechanical clearance, and was not intended to imply safe clearance for workmen. Nevertheless, Whiting provided no specifications for maintenance clearances, and Epstein and the other defendants, unaware of the cranes' maintenance requirements, were justified in relying on Whiting's clearance figures as specified. Plaintiff offered evidence to show that Whiting had, in other crane deliveries, supplied maintenance access specifications and fitted cranes with maintenance platforms for conductor repair. These improvements, along with automatic warning devices, were feasible in 1960, when the first cranes were delivered. A shortcoming in a product's specifications is no less a defect than the failure to provide adequate instructions or warnings, which failure has supported strict tort liability in numerous cases. (*E.g., Woodill v. Parke Davis & Co.* (1980), 79 Ill. 2d 26, 30, 402 N.E.2d 194; *Nelson v. Hydraulic Press Manufacturing Co.* (1980), 84 Ill. App. 3d 41, 44-45, 404 N.E.2d 1013.) Product liability cases in this State have tended to look on the "product" as the entire entity supplied by the seller (*cf. Lewis v. Stran Steel Corp.* (1974), 57 Ill. 2d 94, 101-02, 311 N.E.2d 128 (method of packaging steel plates was defective and dangerous)), so a finding that a product's specifications or installation instructions can be defective conforms to Illinois law.

■■ Whiting's argument that the installation, and not the crane itself, proximately caused plaintiff's injury is not persuasive. The defect in the product need not be the *sole* cause of plaintiff's injury; a finding that a defect in the crane was *a* proximate cause of the injury is enough to sustain plaintiff's verdict. (See *Millette v. Radosta* (1980), 84 Ill. App. 3d 5, 24, 404 N.E.2d 823; *Spotz v. Up-Right, Inc.* (1972), 3 Ill. App. 3d 1065, 1072-73, 280 N.E.2d 23.) The installation of cranes in parallel bays and the presence of maintenance men near the crane rails were foreseeable; the jury therefore could properly find the condition of the crane a proximate cause of plaintiff's injuries.

Whiting also asserts as error the trial court's exclusion of evidence regarding post-occurrence changes made by Allied. After plaintiff's injury, Allied initiated a policy of moving cranes to the end of the bay for service; Allied also installed flashing lights to warn crane operators.

Whiting contends that these facts are relevant to the proximate cause issue, since they assertedly prove that Allied's faulty maintenance procedures were the proximate cause of plaintiff's injury. Allied's purported negligence is certainly relevant to the causation issue, and evidence thereof is admissible. (*Santiago v. Package Machinery Co.* (1970), 123 Ill. App. 2d 305, 310-12, 260 N.E.2d 89.) Nonetheless, evidence of post-occurrence changes is not competent for Whiting's proposed purpose. Post-occurrence changes have been held admissible to prove feasibility in a strict liability action (*Sutkowski*, at 319), but Whiting did not offer the evidence to prove feasibility. In essence, Whiting was attempting to prove Allied's negligence. The established rule in this State is that post-occurrence changes are not admissible to prove negligence. (*American State Bank v. County of Woodford* (1977), 55 Ill. App. 3d 123, 132, 371 N.E.2d 232.) The rationale for this long-standing rule is twofold: correction of unsafe conditions should not be deterred by the possibility that such an act will constitute an admission of negligence, and, more fundamentally, a post-occurrence change is insufficiently probative of prior negligence, because later carefulness does not necessarily imply prior neglect. (*Hodges v. Percival* (1890), 132 Ill. 53, 56, 23 N.E. 423; E. Cleary & M. Graham, Handbook of Illinois Evidence §407.1 (3d ed. 1979).) Both of these rationales apply to the case at bar, so the trial court was correct in excluding Whiting's proffered evidence.

■■ ■ Whiting's next contention concerns a jury instruction given by the trial court:

> "It is the duty of the manufacturer of a product to produce a product which is free from unreasonably dangerous conditions."

Whiting argues that this non-IPI instruction unfairly emphasizes plaintiff's theory of liability, while de-emphasizing Whiting's position that plaintiff's and the other parties' actions constituted misuse of the product.

■■ ■ Initially, we observe that the instruction given is a correct statement of the law. (See Illinois Pattern Jury Instructions, Civil, No. 400.07, Comment, at 28 (1977 Supp.) ("The legal duty incumbent upon a manufacturer or supplier is to produce or to supply a product which is free from unreasonably dangerous conditions"); see generally *Anderson*, at 368; *Rios v. Niagara Machine & Tool Works* (1974), 59 Ill. 2d 79, 85, 319 N.E.2d 232.) Whiting's argument that the instruction de-emphasizes its defense of misuse cannot stand, since misuse is merely an element of proximate cause and should not be the subject of a specific jury instruction. (IPI Civil No. 400.08 (1977 Supp.).) Even though the instruction given was not an incorrect statement of the law, however, we decline to endorse it. The instruction refers to the manufacturer's "duty," and duty is a word of art in negligence law that may tend to blur the distinction between negligence and strict liability in tort. The latter theory

focuses on the defective nature of the product, rather than the duty or acts of the seller. (See *Cunningham v. MacNeal Memorial Hospital* (1970), 47 Ill. 2d 443, 453-54, 266 N.E.2d 897.) Additionally, the instruction given neglects the equally correct statement that a manufacturer has no duty to make a product incapable of causing injury. (See *Hunt v. Blasius* (1978), 74 Ill. 2d 203, 211, 384 N.E.2d 368.) For these reasons, it is preferable to avoid reference to "duty" and maintain the focus on the defective character of the product, as adequately covered by a modified version of IPI Civil No. 400.01, also given by the trial court. Although we do not endorse the instruction given, it is not a technically incorrect statement of the law; it therefore could not have prejudiced Whiting, and cannot be accounted reversible error.

■■ Whiting's final contention is that the trial court improperly struck its defense of assumption of risk. This court must evaluate the trial court's action in striking this defense by applying the *Pedrick* standard. (*Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 431, 261 N.E.2d 305.) Viewing the evidence in the light most favorable to Whiting, we find that the exclusion of the defense was error. A plaintiff assumes the risk of a defective product if he is aware of the defect and its unreasonably dangerous character, but elects to proceed in disregard of such known danger. (*Thomas v. Kaiser Agricultural Chemicals* (1980), 81 Ill. 2d 206, 213, 407 N.E.2d 32.) Plaintiff herein maintains that he was unaware of the dangerous condition of the cranes, but the jury was free to reject plaintiff's protestations of naivete. (See *Sweeney v. Matthews & Co.* (1970), 46 Ill. 2d 64, 66, 264 N.E.2d 170.) Plaintiffs had worked on Allied's cranes for 18 months, and he could have known of the clearance problem, and should have known of the crane operators' practice of not sounding the siren with every crane movement. Furthermore, plaintiff stood on the north side of the "X" brace while conversing with Oyenick. The jury could have inferred that plaintiff took that position because there was too little room between the brace and the disabled crane on the south side, a situation that might have alerted plaintiff to the danger on the north side. The facts do not support the position that plaintiff assumed the risk as a matter of law, but the jury could have found in Whiting's favor on this issue, and the trial court erred in striking the defense.

Plaintiff contends that Whiting cannot have been prejudiced by the striking of the defense. Plaintiff argues that the jury found, on a special interrogatory, that plaintiff was not contributorily negligent, and, having passed this test, plaintiff has necessarily rebutted one of the elements of assumption of risk. Plaintiff acknowledges that the defenses of assumption of risk and contributory negligence are conceptually distinct, but he argues that assumption of risk includes a negligence component. Recent formulations of assumption of risk have emphasized the element of the

plaintiff's appreciation of the unreasonably dangerous character of the risk involved. (See, *e.g., Thomas*, at 213.) Plaintiff concludes from this trend that the knowing acceptance of a risk is an objectively unreasonable act. Implicit in plaintiff's argument is the premise that one can be negligent without assuming a risk, but a person who consciously accepts a known risk is, by that very act, negligent.

Plaintiff can cite only one case squarely supporting his theory. In *Campbell v. Southern Pacific Co.* (1978), 22 Cal. 3d 51, 583 P.2d 121, 148 Cal. Rptr. 596, the California Supreme Court held that a defendant was not prejudiced by the refusal of a jury instruction on assumption of risk where the jury found no contributory negligence on the part of the plaintiff. (22 Cal. 3d 51, 57, 583 P.2d 121, 125, 148 Cal. Rptr. 596, 597-600.) We note that the *Campbell* opinion also refers to assumption of risk as merely a variant of contributory negligence. (22 Cal. 3d 51, 57, 583 P.2d 121, 125, 148 Cal. Rptr. 596, 599-600.) In this connection, the California court cites *Li v. Yellow Cab Co.* (1975), 13 Cal. 3d 804, 532 P.2d 1226, 119 Cal. Rptr. 858. In *Li*, California adopted the comparative negligence method of apportioning liability, and found it necessary to merge assumption of risk with contributory negligence, using the more general term "fault" to encompass both defenses in assessing the parties' relative liability. The California Supreme Court has since applied comparative fault principles to strict liability actions. See *Daly v. General Motors Corp.* (1978), 20 Cal. 3d 725, 730, 575 P.2d 1162, 1164, 144 Cal. Rptr. 380, 382.

Illinois law, however, retains the definition of strict liability as liability without fault. (See *Cunningham*, at 454.) Plaintiff's theory blurs the line between assumption of risk and contributory negligence, and introduces the element of fault into the principal defense to no-fault strict liability in tort. We acknowledge that the distinction between negligence liability and strict tort liability is not as clear as it might be. In *Skinner v. Reed-Prentice Division Package Machinery Co.* (1977), 70 Ill. 2d 1, 374 N.E.2d 437, *cert. denied* (1978), 436 U.S. 946, 56 L. Ed. 2d 787, 98 S. Ct. 2849, our supreme court required that contribution between an employer and a strictly liable manufacturer be apportioned "on the basis of the relative degree to which the defective product and the employer's conduct proximately caused" plaintiff's injuries. (70 Ill. 2d 2, 14.) This process requires a weighing of fault-based liability as against no-fault liability, a conceptualization that has been called "comparative fault." (See *Skinner*, at 24 (Dooley, J., dissenting).) Notwithstanding some imprecision in Illinois decisions distinguishing strict tort liability and its defenses from negligence liability and its defenses, we believe that plaintiff's theory is a departure from present Illinois law, and poses a

novel question more appropriately addressed to the legislature or to the supreme court of this State.

## II

CSE's first contention on appeal is that plaintiff failed to state a cause of action in negligence because CSE had no duty to plaintiff. CSE's position hearkens back to the 19th century and *Winterbottom v. Wright* (1842), 10 M. & W. 109, 152 Eng. Rep. 402, and would hold that there is no duty without privity. That is no longer the law in Illinois. CSE owes a duty to any potential plaintiff to guard against any injury that is a foreseeable consequence of its act. (See *Wintersteen v. National Cooperage & Woodenware Co.* (1935), 361 Ill. 95, 103, 197 N.E. 578.) Since occupants of the building CSE erected were foreseeable, CSE had a duty of care in the construction of the bay.

Prior to the *Suvada* case and the advent of strict liability in tort, the erector of a building was relieved of negligence liability once the owner of the land accepted the finished work, unless the builder's negligence created an "imminently dangerous" condition. (*Paul Harris Furniture Co. v. Morse* (1956), 10 Ill. 2d 28, 40, 139 N.E.2d 275.) Developments in tort law have expanded the definition of "imminently dangerous," and that phrase now comprehends, as initially suggested in *MacPherson v. Buick Motor Co.* (1916), 217 N.Y. 382, 111 N.E. 1050, any instrumentality that puts life in danger when negligently made. (*Johnson v. Equipment Specialists, Inc.* (1978), 58 Ill. App. 3d 133, 138-39, 373 N.E.2d 837.) The erector of a building, therefore, remains liable to third parties for his negligent construction even after the work has been completed and accepted by the landowner. *Johnson*, at 139; accord, Restatement (Second) of Torts §385 (1965).

■■ ■ CSE cites *Hunt v. Blasius* for the proposition that it cannot be held liable for merely following plans provided by Allied. CSE's statement of the law is correct but incomplete. An independent contractor is not negligent in simply carrying out specifications provided him, but when the specifications are such that a reasonably prudent builder would apprehend a danger, the builder's imputed knowledge creates a duty to third persons. This principle was recognized in *Hunt v. Blasius* (1978), 74 Ill. 2d 203, 209-10 (citing *Ryan v. Feeny & Sheehan Building Co.* (1924), 239 N.Y. 43, 46, 145 N.E. 321, 321-22). In the instant case, CSE seeks to shift the blame to Allied, stressing Allied's experience and CSE's unfamiliarity with overhead cranes. CSE cannot avoid liability for its negligence by pleading ignorance of a condition of which it should have been aware. (See generally Restatement (Second) of Torts §385, Comment d (1965).) Plaintiff's theory as regards CSE was that CSE was negligent in failing to

warn Allied or the plaintiff of a danger that it should have recognized. The jury's verdict for plaintiff is not contrary to the manifest weight of the evidence, nor is it inconsistent with the jury's verdict in favor of CSE in the indemnity action. The fact that CSE's negligence may be considered "passive" (a premise necessary to sustain the verdict in the indemnity action; see below) does not vitiate the jury's finding that CSE was in some manner negligent.

CSE's next issue concerns the admissibility of plaintiff's expert testimony. Plaintiff's expert witness was Edward Landry, a consulting engineer with extensive experience in cranes and plant safety engineering, but little experience in steel erection. Expert testimony is admissible when the subject matter is beyond the ken of the average juror, and the witness has skill sufficient to aid the jury's understanding of the facts. (*Crump v. Universal Safety Equipment Co.* (1979), 79 Ill. App. 3d 202, 211, 398 N.E.2d 188.) The evaluation of an expert witness' qualifications is a matter within the discretion of the trial court. (*Harris v. City of Granite City* (1977), 52 Ill. App. 3d 782, 785, 365 N.E.2d 1034.) CSE's objection is based on the fact that Landry's considerable experience was with cranes and not steel erection, but this argument overlooks the fact that the issue here was the placement of the cranes. Landry was allowed to give an opinion on CSE's negligence, but the jury is free to disregard an expert witness' conclusions of fact. (*Presswood v. Morris* (1979), 70 Ill. App. 3d 513, 516, 388 N.E.2d 844.) In sum, CSE has advanced no argument persuasive of its contention that the trial court abused its discretion in allowing Landry's testimony.

■■ CSE also argues that plaintiff was contributorily negligent as a matter of law, and that the jury's answer to a special interrogatory on this issue was against the manifest weight of the evidence. At the outset, we observe that the question of contributory negligence is pre-eminently a jury question (*Geraghty v. Burr Oak Lanes, Inc.* (1955), 5 Ill. 2d 153, 162, 125 N.E.2d 47), and that contributory negligence may be found as a matter of law only by applying the *Pedrick* standard. (*Connolly v. Melroy* (1978), 63 Ill. App. 3d 850, 853, 380 N.E.2d 863.) CSE argues that the facts of the instant case are controlled by *Bitner v. Lester B. Knight & Associates* (1974), 16 Ill. App. 3d 857, 307 N.E.2d 136 (contributory negligence as a matter of law where plaintiff fell from an 8-inch beam he was walking on, and plaintiff knew of danger as he had nearly fallen previously), but the facts of the *Bitner* case are inapposite, especially insofar as the plaintiff in *Bitner* had an alternate means of access to his work location. CSE has attempted to show that plaintiff herein had alternate means of access to the end truck, and need not have approached from the walkway, but none of the supposed alternatives (*e.g.*, a ladder from the plant floor; a route from the crane catwalk over the bridge beam to the end truck) has been shown feasible. Plaintiff's contributory

negligence is measured by the unreasonableness of his acts, and the need to get the job done is relevant to the reasonableness of plaintiff's course of action. (*Connolly*, at 854.) Taking all the evidence in the light most favorable to the plaintiff, we cannot say that the jury's finding that plaintiff was free from contributory negligence was improper. CSE has attempted to pose a dilemma, arguing that if the crane's placement was obviously dangerous, then plaintiff was negligent, and if the specifications and placement were not obviously dangerous, then CSE cannot be found negligent. This logic ignores the fact that plaintiff's oversight is not measured by the same standard as CSE's, and dangers apparent to the steel erector need not be apparent to plaintiff.

III

██ ██ The instant cause of action arose prior to March 1, 1978, so the indemnity issues in this case are controlled by the traditional Illinois rule prohibiting contribution among joint tortfeasors. (See *Skinner*, at 17.) CSE brought an action for indemnity against Allied, and the jury found in favor of CSE. Allied appeals this result, contending that no indemnity is allowable because Allied's negligence was not qualitatively different from CSE's negligence. (See *Chicago & Illinois Midland Ry. Co. v. Evans Construction Co.* (1965), 32 Ill. 2d 600, 603, 208 N.E.2d 573.) This argument merits some scrutiny. CSE's duty as erector was to warn of the danger created by placement of the cranes. Allied's duty as owner of the property was to warn of the danger, or give its employees proper instructions for safe crane maintenance. Both duties to plaintiff Lundy were of the same quality, so an award of indemnity, on these facts, would be improper. (See *Chicago & Ill. Midland Ry. Co.*, at 605-06.) Allied correctly argues that the indemnitee's negligence must be of a "technical" or secondary nature, and not a direct breach of an affirmative duty to the plaintiff in the original action (here, Lundy). (*Crum v. Gulf Oil Corp.* (1979), 70 Ill. App. 3d 897, 901, 388 N.E.2d 1008; *Spivack v. Hara* (1966), 69 Ill. App. 2d 22, 24, 216 N.E.2d 173.) That CSE breached an affirmative duty to plaintiff Lundy is suggested by the facts, and confirmed by the jury's verdict in favor of Lundy on the negligence count. If there were no other evidence, we would be inclined to reverse the indemnity verdict for CSE, and grant judgment notwithstanding the verdict to Allied.

CSE's claim for indemnity, however, has an alternate basis. CSE's claim is founded, essentially, on the premise that CSE was only following Allied's directions in the erection of the structural steel and the placement of the cranes. Epstein was the architect and supervising engineer for the 1960 construction, but for the 1966 addition, Allied simply re-used the 1960 drawings. Allied denies that it acts as its own architect, but the jury could find from Allied's failure to hire an architect for the 1966 addition that Allied assumed some of those responsibilities. Allied has admitted in

its appellate brief and through the testimony of one of its officers that Allied relied on CSE to erect the building in conformance with the drawings furnished. The hazard in the instant case did not rise from the location of the 1960 cranes, but from the placement of the 1966 cranes in close proximity to the original set. If Allied supervised the 1966 addition, it was responsible for the location of the second set of cranes. Allied argues that Epstein's location of footings for the 1966 columns dictated all the features of the 1966 addition, but this is a conclusion of fact that the jury was not required to draw, and apparently did not draw, as Epstein received a favorable verdict in the indemnity action brought by CSE.

■■ Allied also maintains, contradictory to CSE's assertion, that Allied relied on CSE's expertise. Who relied on whom was another fact question for the jury. If the jury could find that Allied controlled CSE in the 1966 construction, then CSE has alleged facts sufficient to state a claim for indemnification. (See *Richard v. Illinois Bell Telephone Co.* (1978), 66 Ill. App. 3d 825, 840, 383 N.E.2d 1242.) The theory of implied indemnity, as set out in *Chicago & Illinois Midland Ry. Co.* (1965), 32 Ill. 2d 600, 602-03, is that two tortfeasors have breached a duty to the plaintiff in the original cause, but because of a qualitative difference between the two parties' negligence, the passively negligent party is permitted to shift his liability to the actively negligent party. By analogy to the rule that a principal is required to indemnify his agent for losses resulting from good faith execution of the agency (*American Telephone & Telegraph Co. v. Leveque* (1961), 30 Ill. App. 2d 120, 127-28, 173 N.E.2d 737), one who controls or instructs another party may be held actively negligent, and the servient party can be found passively negligent even though its acts proximately caused the original injury. *Richard*, at 840.

■■ In the instant case, the jury could have found that CSE acted at Allied's direction. A reviewing court may not substitute its interpretation of the facts for that of the jury when the latter's result is not contrary to the manifest weight of the evidence. (See *Jardine v. Rubloff* (1978), 73 Ill. 2d 31, 43-44, 382 N.E.2d 232.) Allied correctly points out that CSE is not entitled to indemnification if both parties' negligence was active. (*Richard*, at 851.) CSE's negligence was active if CSE acted to create a dangerous condition, but CSE's negligence was passive if it consisted of failing to discover a danger caused by Allied. (See *Chicago & Illinois Midland Ry. Co.*, at 604-05.) Again, this determination was for the jury.

Allied's final argument is that the jury's verdicts are inconsistent, insofar as plaintiff's verdict against CSE shows that CSE had a duty to warn Allied, and the indemnity verdict against Allied shows that it had a duty to warn CSE. This reasoning oversimplifies the scope of the duties involved and ignores the fact that CSE's indemnity verdict is based not on Allied's failure to warn but on CSE's passivity relative to Allied.

## IV

CSE appeals the jury's verdict in favor of Epstein, contending that it is contrary to the manifest weight of the evidence. This action involves an indemnity count similar to that brought by CSE against Allied, so the discussion above is relevant hereto. Whether or not Epstein directed CSE in the 1966 construction is a determination of fact that may indicate whether CSE's negligence was passive, but there is also the threshold question of whether Epstein was in fact a tortfeasor (*i.e.*, negligent) with respect to plaintiff Lundy. On either of these issues, a jury finding in Epstein's favor is supported by the evidence. The result reached by the jury is not inconsistent with the verdict against Allied, owing to the different roles each played in the 1966 construction. Although there was evidence that Allied contacted Epstein in 1966 regarding the construction of another bay on the 1960 footings, the jury was not required to conclude that Epstein's act of designing a foundation for a future building should create liability for the defective design of that building. Consequently, the verdict was not contrary to the manifest weight of the evidence.

In view of our conclusion that the jury's verdict was proper, we do not address Epstein's contention that architectural malpractice can be proved only by offering the testimony of an architectural expert. Suffice it to say that Epstein has not been able to cite any Illinois cases in support of this proposition, and we have been able to find none.

In consideration of the foregoing, we affirm the judgment entered in favor of plaintiff against CSE, and we affirm the indemnity verdicts in favor of CSE against Allied, and in favor of Epstein against CSE. The appeals by Allied and CSE from the dismissal without prejudice of the "fourth party" complaints are dismissed as premature. Because Whiting was improperly denied the defense of assumption of risk, we reverse the judgment against Whiting, and remand the cause for retrial on the strict liability count alone. A new trial involving defendant Whiting need not consider plaintiff's damages, since we believe that the amount awarded below was not affected by the jury's failure to pass on the issue of assumption of risk. (See *Dazenko v. James Hunter Machine Co.* (7th Cir. 1968), 393 F.2d 287, 291 & n.7.) If Allied and CSE elect to press their indemnity claims against Whiting, the trial of these "fourth party" complaints may be joined with the retrial of the strict liability claim. All other issues and claims are herewith disposed of.

Affirmed in part; reversed in part; remanded with directions.

HARTMAN, P. J., and PERLIN, J., concur.