JACK GOWLER, Plaintiff-Appellee, v. FERRELL-ROSS COMPANY, successor to Ross Machine Company, a corporation, Defendant-Appellant (Russell W. Fox, d/b/a Fox Construction Company, et al., Defendants).

First District (1st Division) No. 1—88—2767

Opinion filed September 4, 1990.—Rehearing denied December 26, 1990.

---

Kiesler & Berman, of Chicago (Edward L. Cooper, of counsel), for appellant.

Perz, Condon, Ridge & Capron, of Chicago (Joseph T. McGuire, of counsel), for appellee.

JUSTICE CAMPBELL delivered the opinion of the court:

Defendant, Ferrell-Ross Co., appeals from a judgment entered against it and in favor of plaintiff, Jack Gowler, for the sum of $794,304 as damages for personal injuries sustained by plaintiff when his hand was caught in the rollers of a Ross cracking mill, a machine manufactured and distributed by defendant. On appeal, defendant contends that: (1) plaintiff had failed to establish that the Ross cracking mill was in the same condition at the time of the accident that it was in when it was manufactured; (2) the trial court erroneously admitted into evidence testimony and exhibits relating to subsequent accidents which had occurred on similar Ross cracking mills; (3) plaintiff's counsel's comments during *voir dire* that the court would prevent double recovery prejudiced defendant; (4) plaintiff's counsel's comments during opening argument as to the cracking mill's serial number identification plate were improper on the ground that he never introduced evidence as to the serial number identification plate; (5) it was prejudicial error for plaintiff's counsel to discuss with the venire the nature and purpose of the evidence to be presented; (6) defense witness Joseph Naylor was improperly limited in his testimony as to his direct knowledge of the operation and expertise of defendant; (7) the trial court erroneously allowed into evidence documents relating to defendant's corporate history; (8) the

trial court unduly restricted defendant's cross-examination of plaintiff's expert, Irving Hazard; (9) the trial court erroneously denied defendant's instructions as to assumption of risk; (10) plaintiff's counsel's closing argument was so prejudicial and improper as to cause reversible error; (11) the trial court erroneously allowed plaintiff, after he had rested his case, to testify that the photographs taken in 1985 were photographs of the Ross cracking mill as it existed in 1978; and (12) comments made by the trial court during trial, testimony as to plaintiff's earning capacity, the trial court's limitation on defendant's impeachment of plaintiff and the trial court's refusal to admit defendant's exhibits depicting alleged lockout procedures constituted reversible error. For the following reasons, the judgment of the trial court is affirmed.

According to the record, the Ross cracking mill, the machine at issue in the present case, was integrated into the soybean processing system of the Archer-Daniels-Midland (ADM) plant, located in Galesburg, Illinois. Plaintiff was employed by ADM as a maintenance "B" worker. The Ross cracking mill is equipped with a feeder on the front of the machine through which soybeans are fed down between two sets of cracking rollers. The rollers crack and crush the beans, which are then discharged into the bottom of the cracking mill and pass into the sifting phase of the process.

On December 9, 1977, approximately 3 a.m., during plaintiff's work shift at ADM, the electrical power went off in the plant for approximately one minute. Whenever there is a power outage, clogged soybeans have to be removed by hand from the cracking mills. This procedure was part of plaintiff's job. Plaintiff first removed the clogged soybeans from an Allis-Chalmers cracking mill. Because the electrical power was on by this time, plaintiff made certain that the power switch for the Allis-Chalmers mill was in the "off" position before commencing removal of the beans from that mill. The power switches for the four cracking mills were located on the wall. After plaintiff finished cleaning the Allis-Chalmers mill, he told the mill operator that he could start that machine. Plaintiff then went over to the Ross cracking mill. Before commencing the unclogging procedure, he made certain the power to the mill was turned off. He then started to clean it by reaching his hand through the feeder door and removing the clogged soybeans from the rollers. While he was cleaning out the clogged soybeans, someone turned the power switch on to the Ross cracking mill and plaintiff's hand was caught in the turning rollers. One of the workers eventually turned off the power, but the rollers kept rolling a short period longer until they stopped on

their own. As a result of the incident, plaintiff suffered severe hand injuries.

On December 29, 1978, plaintiff filed his complaint against defendant, alleging that the Ross cracking mill was unreasonably dangerous because it failed to provide a fail-safe interlock door device to prevent the mill's actuation while the feeder door was open. Approximately one year later, plaintiff filed an amended complaint, adding as parties defendant: Russell W. Fox, d/b/a Fox Construction Co., Haskins Electric Co., Louis T. Langhurst and Maxwell Electric Co. However, plaintiff later nonsuited the additional defendants and filed a second amended complaint solely against Ferrell-Ross, Inc., which alleged that the Ross cracking mill, as designed, manufactured and distributed, was unreasonably dangerous in that it:

> "(a) was not equipped with a barrier guard to prevent human entry into the in-running nip point between the cracking rolls;
>
> (b) no warning was provided to maintenance operators of the danger of unintentional actuation of the cracking mill rollers during unclogging operations;
>
> (c) no specification and instruction was provided on a safe technique for foreseeable unclogging operations;
>
> (d) no warning was provided to maintenance operators to perform no unclogging operations without a lockout mechanism in place;
>
> (e) there was no provision or specification of properly located electrical controls to provide for operator and maintenance operator safety;
>
> (f) there was no provision or specification of a start-up alarm with the time delay actuation."

Following a jury trial, the jury returned a verdict assessing damages against defendant in the amount of $794,304. Judgment was entered on the verdict and defendant appealed.

Initially, defendant contends that the Ross cracking mill was substantially and materially changed by ADM so as to preclude any claim that the mill was unreasonably dangerous when it left defendant's control. Specifically, defendant states that the feeder door through which plaintiff reached had not been manufactured by defendant; the roll release level had been clamped shut by ADM; and the roller guard had been removed.

In response, plaintiff contends that the injuries were not caused by any of the changes made by ADM. Rather, they were caused by inadequate protection from the in-running nip during clog-clearing

activities. Because this condition was a design defect, plaintiff argues that it was present when the mill left defendant's control. Moreover, regarding each of the changes defendant alleges ADM had made to the mill, plaintiff claims they were not substantial and material. First, the fact the feeder door was not made by defendant is irrelevant. Whatever type of feeder is used, the risk, hazard and danger of the in-running nip remain the same. Second, the roll release lever is merely a device to adjust the roll clearance for cracking or grinding the grain. It is not a mill unclogger. Thus, the fact it was clamped shut had no relevance to the incident. Third, there was no "guard" over the roller as defendant suggests. The "guard" defendant refers to is actually a scalping screen supplied by ADM at defendant's recommendation to keep out foreign particles during mill operations. In order to unclog the mill, the screen must be removed. Fourth, it is foreseeable that the mill will become clogged and that in order to unclog the mill, a person would have to put his hand through the feeder door. Despite this foreseeability, plaintiff alleges that defendant failed to provide unclogging procedures and instructions. In fact, one of defendant's own witnesses, Roscoe Warner, testified that the mill should have had a lock-out device.

In its reply brief, defendant contends, without explanation, that even if a safety device had been installed to the feeder door, it would not have prevented the accident. Moreover, because the whole system would have to shut down, not just the mill, ADM would have found a way to circumvent any safety device. As a general rule, an injured plaintiff may recover damages from a manufacturer under a product liability theory if he proves that his injury resulted from an unreasonably dangerous condition of the product that existed at the time it left defendant's control. (*Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182.) However, if the condition of the product has been substantially altered from its original condition by the plaintiff, he will not be able to establish defendant's liability. *Berry v. Gibson* (1986), 141 Ill. App. 3d 876, 491 N.E.2d 33.

In our view, plaintiff established that the Ross cracking mill lacked a protective interlock for the in-running nip for use during clog-clearing activities when the mill left defendant's control and that the alterations made by ADM were irrelevant to the cause of the injury. Accordingly, we conclude that plaintiff provided sufficient evidence to support the jury's verdict that the lack of this safety device was an unreasonably dangerous design defect that caused his injury.

Next, defendant contends that the trial court erred in admitting into evidence testimony and exhibits as to subsequent accidents

which occurred on similar Ross cracking mills. Defendant argues that the evidence as to subsequent accidents, *i.e.*, testimony by other injured parties, photographs of other Ross cracking mills, answers to interrogatories in other actions and an invoice for the purchase of another Ross cracking mill, was prejudicial, had no probative value and its only purpose was to inflame the jury.

In response, plaintiff claims that the evidence was probative in that it related to substantially similar accidents which had occurred on Ross cracking mills as the result of the mill's inadequate protection from the in-running nip. Therefore, it was admissible to show the unreasonably dangerous design of the Ross cracking mill. Further, plaintiff explained that because defendant repeatedly stated during trial that it was uncertain as to whether it had manufactured the mill in question because the mill did not have a "Ross" nameplate, plaintiff had to introduce photographs of other mills made by defendant which had the nameplate to show that their design was identical to the mill in question. Regarding the invoice for another mill shipped to a different location, plaintiff explained that it had been introduced to establish the time frame within which defendant had designed and had shipped a mill similar to the mill in question. Further, photographs of mills that were designed by defendant subsequently to the one shipped to ADM were necessary to show that although external design details had changed, the in-running nip hazard remained unaddressed.

As a general rule, admission of evidence of either prior accidents or subsequent accidents is proper if, at the relevant times, the equipment involved was in substantially the same condition and the accidents were sufficiently similar. (*Rucker v. Norfolk & Western Ry. Co.* (1979), 77 Ill. 2d 434, 396 N.E.2d 534; *Wiedemann v. Industrial Erectors, Inc.* (1985), 137 Ill. App. 3d 47, 483 N.E.2d 990.) The accidents need not have occurred in an identical manner. All that is required is that they be substantially similar. (*Rucker*, 77 Ill. 2d 434, 396 N.E.2d 534.) In *Rucker*, plaintiff's decedent was killed when a petroleum gas tank car exploded when punctured by a coupler. At trial, plaintiff admitted evidence of 42 prior accidents involving punctures of tank cars which had not been equipped with headshields to show the danger of the design. Defendant objected on the ground that in 16 of the incidents, the puncture had occurred in a manner other than by a coupler. On appeal, the *Rucker* court affirmed the trial court's decision to admit evidence of all 42 accidents on the ground that the point plaintiff sought to make was that the tank car was susceptible to puncture when not equipped with a headshield.

■ Similarly, in the present case, evidence of the subsequent accidents involved cracking mills manufactured by defendant which were not equipped with a protective device for the in-running nip. Each accident occurred when the injured party put his hand into the same part of the cracking mill to correct a problem. Thus, the cracking mill involved in each accident had the same design defect as did the cracking mill on which plaintiff was injured and the resulting injuries from the other cracking mills were similar to the injury incurred by plaintiff. Therefore, the trial court properly admitted evidence of subsequent accidents. Further, the admission of the invoice and photographs of other mills was proper on the ground that they were probative as to the issue of whether defendant had manufactured the mill in question.

Defendant further argues that plaintiff's counsel's comments during *voir dire* that plaintiff had not received any money for his injuries and that the jury was not to speculate as to double recovery were highly prejudicial and constituted grounds for reversal. Specifically, defendant cites to the following:

"[PLAINTIFF'S COUNSEL]: The great principle of law that applies to this case and applies to every case in the courthouse is called the principle against double recovery. There is nobody in this courthouse that ever gets money twice. Nobody that is running this system is going to reward this plaintiff the second or the third time for damages that he received. He's only entitled to one set of damages.

Now, can you follow that principle in this case and not speculate outside the case whether or not by you doing your job on the damages, listening to the instructions, giving him what you know the evidence in the case warrants and requires and not speculate outside that maybe you're now giving him a second recovery. Do you think you can do that?"

■ In its argument, defendant has failed to indicate how these comments during *voir dire* prejudiced him and cites to no authority which would support his argument that the comments constitute reversible error. The cases relied upon by defendant, *Chamness v. Odum* (1979), 80 Ill. App. 3d 98, 399 N.E.2d 238, and *Robinson v. Greeley & Hansen* (1983), 114 Ill. App. 3d 720, 449 N.E.2d 250, state that evidence as to workers' compensation recovery is prejudicial because it could have the effect of decreasing the jury's award. This holding directly contradicts defendant's argument. Apparently, defendant believes that eliminating any concern about double recovery would increase the jury's award. However, Illinois law does not

address this concern. In fact, in *Robinson v. Greeley & Hansen* (1983), 114 Ill. App. 3d 720, 449 N.E.2d 250, a comment referring to the jury award as plaintiff's "one chance for the compensation" was found to be proper even though the plaintiff also had a remedy under the Workers' Compensation Act (Ill. Rev. Stat. 1983, ch. 48, par. 138.1 *et seq.*). The court reasoned that the purpose of the Act is to provide financial protection, not compensation. Thus, the comment had been factually correct and proper. Similarly, in the present case, plaintiff's counsel's comment was also factually correct. Further, defendant has failed to indicate how counsel's comments prejudiced him. Accordingly, we do not find that the comments provide grounds for reversal.

Defendant further argues that plaintiff's counsel's comments during opening argument as to the cracking mill's serial number identification plate were improper on the ground that he never introduced evidence as to the serial number plate. During his opening statement, plaintiff's counsel made the following comments about the serial number plate:

"The invoice that I mentioned for the 2196 serial number shows that the machine when it was sold was sold with what's known as a Rossomatic feeder. A Rossomatic is just another feeder like most of the feeders in the business. They are not much different than a feeder can be if it is in the roller-type feeder. And the Rossomatic was one of these ordinary—I believe it was a single-roller feeder.

The Archer Daniels Midlands Company—now, let me tell you that the invoice shows that 2196, that serial number, with its Rossomatic feeder was delivered to the Fredonia, Kansas, location of Archer Daniel Midlands. There is evidence that it later after it had been used for a few years at Fredonia was sent to where they wanted to process the soybeans instead of in Kansas in Galesburg, Illinois. So they shipped the machine to Galesburg.

When it came to Galesburg, they already had what is called a Langhurst, a complete machine standing in that spot. But they wanted to use the Ross machine so the employer left the feeder which is hooked up to all the—you know, the soybeans come in through an air duct affair and they are pumped in that way and they come down on a gravy feed and they pour into the top of this feeder (indicating).

Well, now, that feeder was kept just the way it was, connected with everything, and they disconnected the Langhurst

and they put the Ross right under that feeder. Now, by doing that, they had to take the Rossomatic feeder off of it. Therefore, the label, the serial number stamping was taken off of the feeder and it was put in an envelope somewhere in the office in the manufacturing plant in Galesburg. There was no serial number label on the machine on the day Jack Gowler was injured. But they ran in and got it five, six months later when somebody said, 'What is the serial number of the machine? We know it is a Ross, but when did you buy it?' That was us. We started to ask questions.

They came out and put Serial No. 2196 on it, and you will see this picture taken—I think it was, oh, maybe six months after the occurrence when we got this picture—that there is no plate on it. Then pictures taken about a year later had the 2196 serial number on it, but not to worry.

Let me explain to you what that means. Part of the defense of this case is that this isn't our machine. You see that says Ross. We don't own Ross. We didn't merge with Ross. But the truth is, they bought all of Ross' assets, and any sale of a Ross machine from January 22nd, 1964, on wasn't a sale by Ross. It was a sale of a Ross mill by the Burroughs Company. And of course, the company we sued is the J.P. Burroughs Company. And J.P. Burroughs was a subsidiary or had a subsidiary called Ferrell-Ross, and Ferrell-Ross was the name of the corporation that operated the Oklahoma City Ross plant. But they are all linked."

Defendant contends that these comments were erroneous and prejudicial because plaintiff failed to introduce any evidence at trial to prove that the events regarding the serial number plate had occurred as described during plaintiff's opening argument. In fact, at trial, Roscoe Warner, former director of engineering for defendant, testified that the 2196 serial number plate allegedly affixed to the cracking mill after plaintiff's injury was not the correct serial number for the model on which plaintiff had been injured.

■ Once again, defendant has failed to indicate how the lack of proof to substantiate plaintiff's opening statement prejudiced him. Moreover, although plaintiff's counsel was unsuccessful in tying up serial number 2196 to the cracking mill which injured plaintiff, the record indicates that he attempted to provide evidence that the serial number plate 2196 belonged on the cracking mill in question. The fact that he was unable to do so does not render his opening statement prejudicial.

Furthermore, none of the cases relied upon by either plaintiff or defendant is relevant to this issue: *McCarthy v. Spring Valley Coal Co.* (1908), 232 Ill. 473, 83 N.E. 957 (plaintiff's counsel's comment during opening argument that plaintiff had a wife and children served only to gain jury's sympathy); *Sawicki v. Kim* (1983), 112 Ill. App. 3d 641, 445 N.E.2d 63 (comment during opening statement on inadmissible evidence is prejudicial); *Hooper v. Mizyad* (1981), 98 Ill. App. 3d 768, 424 N.E.2d 851 (single statement made by plaintiff's counsel in a record exceeding 500 pages cannot be said to have prejudiced defendant).

Next, defendant contends that it was prejudicial error for plaintiff's counsel to discuss with the venire the nature and purpose of the evidence to be presented. Defendant argues that the questioning used by plaintiff's counsel to prospective juror Colvin during *voir dire* was improperly intended to indoctrinate and preeducate her, thereby prejudicing her against defendant's position. During *voir dire*, plaintiff's counsel conducted the following line of questioning:

"[PLAINTIFF'S COUNSEL]: Okay. The defendant in this case is a corporation and part of the evidence in this case will be—.

[DEFENSE COUNSEL]: Your Honor, I have to object to what that evidence will be at this stage.

THE COURT: Overruled, Counsel. Proceed.

[PLAINTIFF'S COUNSEL]: Part of the evidence in this case will be part of the succession of these corporations that relate to the manufacture of this particular milling machine that was produced either in the late 60's *** or the early 70's. Do you understand that?

[DEFENSE COUNSEL]: Your Honor, I have to object because that's one of the issues in question.

THE COURT: Overruled, Counsel. Proceed.

[PLAINTIFF'S COUNSEL]: Now, we will produce this evidence for you and the purpose of it will be to identify the one who designed, manufactured, and placed into the stream of commerce this particular milling machine. Do you understand that?

VENIREMAN: Yes, I understand.

[PLAINTIFF'S COUNSEL]: And one of your jobs will be to deliberate the evidence about that corporate chain. And in connection with the liability in this case—and as the court told you—the defendant is the Blount Agreindustrial Corporation, Incorporated, a division of Blount, Incorporated and the origi-

nal machine has the name Ross on it. You will begin with the evidence with that word Ross on it.

[DEFENSE COUNSEL]: Your Honor, I have to object to him presenting testimony in picking the jury.

THE COURT: I believe thus far, counsel, it's proper interrogation. The objection is overruled.

[PLAINTIFF'S COUNSEL]: Now, you understand that when we are presenting that evidence, the purpose of that evidence is to show you that the Ross name on the front of the machine was purchased by the predecessor corporation of the Blount Agreindustrial Corporation. Evidence will be offered to show that they had purchased the good will, the name and the patents and the designs and then went ahead and produced these machines where they kept the name Ross on the machines.

[DEFENSE COUNSEL]: Your Honor, I have to be heard on this.

THE COURT: You have to object?

[DEFENSE COUNSEL]: Yes.

THE COURT: The objection will be overruled, Counsel, because that is one of the issues that you neither admit nor deny and you are asking strict proof. He is giving it.

[DEFENSE COUNSEL]: I believe that the prospective juror on board—.

THE COURT: The objection will be overruled. Proceed.

[PLAINTIFF'S COUNSEL]: All right. Now, you will be willing to listen to evidence that relates to that subject such as I have described, wouldn't you?

VENIREMAN: Yes, I would be willing to listen.

[PLAINTIFF'S COUNSEL]: And will you follow that evidence, too, wherever it leads you and then honestly return that verdict in that jury room with your fellow jurors, won't you?

VENIREMAN: Yes."

The purpose of *voir dire* is to permit counsel to ascertain whether the minds of prospective jurors are free from bias or prejudice. The manner and scope of the questioning is within the court's discretion. (*People v. Muhammad* (1985), 132 Ill. App. 3d 901, 478 N.E.2d 457.) When *voir dire* becomes an attempt to indoctrinate or to preeducate jurors, to obtain a pledge as to how they would decide under a given state of facts or to determine which party they would favor in a litigation, it may be serious error for the court not to cut

off *voir dire. Gasiorowski v. Homer* (1977), 47 Ill. App. 3d 989, 365 N.E.2d 43.

■ In the present case, the questioning of plaintiff's counsel appears to go beyond the mere ascertaining of whether the juror is free from bias or prejudice. However, it does not rise to the level of indoctrinating or preeducating the prospective juror. As evidenced by counsel's query to the prospective juror as to whether she would be able to follow the evidence, counsel was merely attempting to ascertain whether the juror could intellectually comprehend the details of the chain of corporate ownership, an integral part of plaintiff's argument. Accordingly, the questioning did not prejudice defendant.

Defendant next contends that it was denied its right to properly present its defense when the trial court sustained plaintiff's objection to questions asked of defense witness Naylor as to defendant's expertise in electrical connections and as to the cracking mill being merely a component part of a system which defendant did not install. Defendant further argues that Naylor should have been allowed to testify as to his own personal knowledge regarding the roll release lever on the cracking mill.

In response, plaintiff argues that the trial court properly prevented Naylor from testifying as to his opinion regarding the cracking mill on the ground that defense counsel had failed to disclose Naylor as an expert witness pursuant to Supreme Court Rule 220 (107 Ill. 2d R. 220). Further, Naylor's attempt to characterize the cracking mill as merely a component in the soybean processing system was not supported by the evidence.

At the outset of the testimony of Joseph Naylor, former director of engineering for defendant, a sidebar took place during which the court limited Naylor's testimony to that of a factual witness, *i.e.*, he could testify as to anything that was going on at the particular ADM plant where the accident had occurred, but he could not give an opinion. Defendant did not object to this limitation.

Naylor commenced his testimony with a general description of the soybean milling process. When queried as to how the machines were powered, Naylor stated that they were powered by electricity. At that point, plaintiff objected on the ground that Naylor had never even established that he had ever been at the Galesburg plant, where plaintiff's accident occurred. In response, Naylor admitted that he could not remember having been at the plant prior to plaintiff's accident.

In a sidebar, the court noted that it was becoming increasingly clear that Naylor should have been identified as a Rule 220 witness.

Defense counsel claimed that neither party had complied with Rule 220. The court responded that while defendant had not objected to plaintiff's noncompliance with the rule, plaintiff had objected to defendant's noncompliance and the court was sustaining plaintiff's objection. The court added that only one machine is at issue and if Naylor testifies as to that machine, he will be testifying as an expert, which is not allowed.

Following the sidebar, Naylor testified as to changes made to the Ross cracking mill by ADM, such as an added door latch, C-clamps and square guards. The trial court sustained objections to Naylor's testimony as to the functions of the roller release lever. Subsequently, in an offer of proof, Naylor testified that when he was working for defendant, defendant had placed a guard into the cracking mill, but had to remove it because it had caused product contamination; that defendant had no electrical expertise; that defendant sold cracking mills without feeders if the customer requested such a model; and that he had never seen a cracking mill with an interlocking device.

■■ When a witness testifies as to his own observations, he is not an expert witness who has to be disclosed under Rule 220. (*Exchange National Bank v. Air Illinois, Inc.* (1988), 167 Ill. App. 3d 1081, 522 N.E.2d 146.) Rather, an expert witness "is a person who, because of education, training, or experience, possesses knowledge of a specialized nature beyond that of the average person on a factual matter material to a claim or defense in pending litigation and who may be expected to render an opinion within his expertise at trial." (107 Ill. 2d R. 220(a)(1).) Failure to disclose an expert witness pursuant to Rule 220 will result in disqualification of the expert as a witness. 107 Ill. 2d R. 220(b)(1).

■■ In the present case, defendant admitted that it had not disclosed Naylor as an expert witness, but claimed there had been an agreement between the parties that they would not comply with Rule 220. Plaintiff denied the existence of such an agreement. Regardless of whether such an agreement was reached, this court cannot condone an agreement to violate supreme court rules. These rules are construed as law and, as such, mandate compliance. Because defendant had failed to comply with Rule 220, the trial court properly limited Naylor's testimony to relevant factual observations. In that regard, because Naylor had never been at the Galesburg plant prior to the accident, he had no relevant factual observations to relate.

Further, defendant's attempt to characterize the Ross cracking mill as a component part in the whole soybean processing system, in

order to avoid liability, is without merit. (See *Curry v. Louis Allis Co.* (1981), 100 Ill. App. 3d 910, 427 N.E.2d 254.) The cracking mill was a fully integrated machine, which, together with other machines performing different functions, constituted a processing system similar to an assembly line. Accordingly, we conclude that the trial court properly limited the testimony of defense witness Naylor.

Next, defendant contends that the trial court erred in allowing into evidence documents relating to the corporate history of defendant. Specifically, defendant argues that exhibits 3, 4, 5, 6, 7, 8, 9, 10, 11 and 12, allowed into evidence, had no useful purpose and only served to confuse the jury. Therefore, their admission into evidence constituted an abuse of the trial court's discretion.

██ Exhibits 3 through 12 relate to the corporate history of defendant, focusing on the merger of J.P. Burroughs with Blount, and the subsequent merger of J.P. Burroughs and Ferrell-Ross. Defendant's contention that these documents served no useful purpose is belied by the fact that one of the issues before the trial court was whether the successor company was liable for injuries caused by products manufactured by the predecessor company. It is clear that in order for the jury to understand the corporate history, the various transactions between the companies had to be explained. The exhibits merely supported the explanation and were relevant to the issue of liability. Admittedly, the exhibits are detailed and present more information than may have been necessary. However, excerpts from those documents could have been misleading if taken out of context. Moreover, defendant has failed to explain how the specified exhibits confused the jury. Accordingly, we conclude that the trial court properly admitted exhibits 3 through 12 into evidence.

██ ██ Defendant contends that the trial court erroneously sustained objections to its questioning of plaintiff's expert, Irving Hazard, as to an employer's duty to furnish special tools to the employees and an employer's responsibility to retain a consulting engineer if that employer lacks the necessary expertise. Defendant claims that these questions were directly related to its defense that ADM's negligence was the proximate cause of plaintiff's accident.

Even though a plaintiff's negligence is generally not an issue in a products·liability case, evidence relating to the plaintiff's conduct is admissible to establish defendant's theory of defense that the machine was not unreasonably dangerous and the sole proximate cause of plaintiff's injury was the negligent conduct of plaintiff's employer. (*Sanchez v. Black Brothers Co.* (1981), 98 Ill. App. 3d 264, 423 N.E.2d 1309.) In *Sanchez*, plaintiff filed a product liability action

against defendant to recover damages for injuries sustained to his right hand while attempting to clean a glue-spreading machine manufactured by defendant. A jury returned a verdict for defendant. On appeal, plaintiff argued that evidence of plaintiff's conduct in using the machine at the time of the occurrence and a set of 11-point cleaning instructions should not have been admitted in a product liability action. The *Sanchez* court stated that the liability issue in a product liability action "cannot be tried in a vacuum," and that the jury should be fully informed as to the circumstances surrounding the incident. (98 Ill. App. 3d at 266.) Moreover, the *Sanchez* court stated that both parties have a right to present evidence to support their theories and if defendant established its theory, it would escape liability. Accordingly, the court held that defendant's evidence as to plaintiff's conduct and as to the cleaning instructions was properly admitted.

In the present case, during cross-examination of Irving Hazard, defendant queried Hazard extensively about ADM's compliance with OSHA requirements as to warning signs on the machinery. Even after a sidebar and a further objection by plaintiff, the court allowed defendant to continue that line of questioning. However, when defendant asked Hazard whether an employer has a duty to furnish special tools to an employee so that he does not have to stick his hand into the machine, the court sustained plaintiff's objection, stating that defendant cannot delegate responsibility. Defendant then asked if special tools would have prevented the accident. Hazard replied that there was no guarantee that they would. Although the question of ADM's duty may have been relevant to defendant's theory of defense, in light of the fact that special tools were not shown to have been able to prevent the accident, defendant was not prejudiced by the court's limitation on its question as to the employer's duty to supply special tools.

In addition, defendant claims that it should have been allowed to question Hazard as to an employer's obligation to retain a consulting engineer. During cross-examination, defendant asked Hazard if the manufacturer had a duty to instruct someone as to how to wire a machine. Hazard replied:

> "The people like Farrell-Ross [*sic*] that sell a machine without a control have to be able to control what is going to be done with their machine in terms of safety. The only way they can control that is [to] issue instructions, wiring diagrams, parts lists and whatever is necessary to guarantee that an appropriate control will be put on the machine in a proper place.

If they do not have the expertise to do that, then they can contract to have a consulting engineering firm come right into their firm, work with them in understanding their machine and develop a control for their machine which can be packaged and sold with the machine or develop a set of instructions, drawings and whatnot to insure that other people down the line on the consuming end will be able to issue these instructions to their electrical contract people and say, 'This is what has to be done. You've got to put a switch here.' "

Defendant then asked Hazard if he found any problem with a user such as ADM hiring a consulting firm. The court sustained plaintiff's objection.

Again, defendant has failed to indicate how the court's ruling on this objection prejudiced his defense. Further, whether or not Hazard thought there "would be a problem" with ADM's hiring a consultant had no relevance to either party's legal theory. Accordingly, the trial court properly sustained plaintiff's objections to defendant's line of questioning directed to Irving Hazard.

■■ Defendant next contends that the trial court erred in denying defendant's instructions as to assumption of risk. Defendant cites to three proposed instructions it had presented to the trial court, which were subsequently refused, and claims that the trial court erred in not allowing it to instruct the jury as to assumption of risk. Defendant's argument has no basis in fact. Instructions 1, 3, and 4, to which defendant refers, do not address assumption of risk. Instead, they refer to contributory negligence, which has no relevance to a product liability cause of action. Accordingly, we decline to further address this issue.

■■ Next, defendant contends that the following comments by plaintiff's counsel during closing argument were prejudicial:

"You are going to represent the community, a conscience of the community, and the justice of the community is in your hands.

* * *

God bless you all."

Defendant does not indicate what the prejudicial effect of the latter comment was, but, in reliance on *Williamson v. City of Springfield* (1984), 125 Ill. App. 3d 361, 465 N.E.2d 1035, defendant claims that the comments concerning the "community" create a prejudicial "ripple effect of the verdict." In *Williamson*, defense counsel commented to the jury:

" 'Now, exercising your duties as jurors and in circum-

stances like this, could not be—could not be more difficult, but it's the courage to do this that makes a difference. When you throw a pebble into a pond, the ripples go out and affect a lot of people, a lot of other cases, and I assure you that your verdict in this case will affect a lot of other cases. So, it's just not acting in terms of one woman, it's acting in terms—.' " 125 Ill. App. 3d at 365.

Without analysis, the *Williamson* court held that the aforementioned comment was improper and, because the cause was being remanded for a new trial on other grounds, stated that the comment should be avoided upon remand. However, the court did not find that the comment itself constituted reversible error.

Because the comment in the present case is not at all analogous to that in *Williamson* and defendant has failed to show how either of the comments to which it objects was prejudicial, we conclude that the trial court did not err in overruling defendant's objections.

■■■ Defendant further argues that the trial court erred in allowing plaintiff, after he had rested his case, to testify that the photographs taken in 1985 were photographs of the Ross cracking mill as it existed in 1978. Defendant contends that the photographs should not have been admitted into evidence because no proper foundation had been laid that the Ross cracking mill was in essentially the same condition at the time of the accident that it was in at the time of the photographs. In their briefs, neither party cites to pages in the record where the photographs had been introduced into evidence. Accordingly, it is not clear to this court whether objections had been made to their admissibility or whether a foundation had been laid. A court of review is not obligated to search the record for evidence on which to base reversal, and, unless reference is made to those parts of the record supporting reversal, the argument will not be considered. *Webb v. Angell* (1987), 155 Ill. App. 3d 848, 508 N.E.2d 508.

■■■ Finally, defendant contends that the comments made by the trial court during trial, the testimony as to plaintiff's earning capacity, the trial court's limitation on defendant's impeachment of plaintiff and the trial court's refusal to admit defendant's exhibits depicting ADM's alleged lockout procedures constituted reversible error. Defendant contends that these alleged errors "added to the prejudice created" against it during trial. In reviewing these allegations, this court is cognizant that wide latitude must be allowed a trial judge in conducting a trial (*Vinke v. Artim Transportation System, Inc.* (1980), 87 Ill. App. 3d 400, 408 N.E.2d 1112), and that it is not an appellate court's function to determine whether a record is completely

free from error. Rather, the appellate court is to determine whether any error acted to prejudice the rights of a party. *Foerster v. Illinois Bell Telephone Co.* (1974), 20 Ill. App. 3d 656, 315 N.E.2d 63.

 Regarding the trial court's comments, defendant cites to four specific instances. First, while plaintiff's counsel was questioning Louis Griffin, corporate secretary of Blount, Inc., as an adverse witness, about mergers and acquisitions made by the parent company, plaintiff referred to a warranty deed issued to the Ferrell-Ross division of J.P. Burroughs & Sons. Defendant objected on the ground of relevancy. The trial court overruled the objection "at this time," stating that plaintiff would connect it up. In our view, the condition of "at this time" placed upon the ruling indicates that if plaintiff did not connect it up, the trial court would sustain the objection. Although at the time of defendant's objection, plaintiff did not specifically state that he would connect it up, it was evident from the context of the questions that plaintiff was reviewing a series of documents for the purpose of developing a chain of corporate identity. The trial court's comment merely recognized the purpose and reserved an opportunity to change its ruling in the event the item proved to be irrelevant.

Second, defendant objects to the following question directed by the trial court to plaintiff's expert witness, Irving Hazard, after Hazard had identified several photographs of the Ross cracking mill:

"THE COURT: When were these pictures taken, Mr. Hazard?

HAZARD: These were taken that we are referring to in '79.

THE COURT: Were they taken by you?

HAZARD: No.

* * *

THE COURT: Was the machine in the same condition in '85 as you see it on this picture?

HAZARD: With the exception of the name plate, it is my understanding that it was exactly the same condition, and from what I can see in the photographs, it was in the same condition.

THE COURT: All right. That's all I'm asking for is what you see in the photographs.

HAZARD: Yes, your Honor.

[DEFENSE COUNSEL]: Judge, I still would object because those pictures—the testimony is those pictures were taken in '79.

We still have a two-year lag between the accident and those pictures.

THE COURT: He says it's the machine that he saw in '85. It's permissible."

In our view, the trial court was merely clarifying the foundation which had been laid for the photographs and was acting within the bounds of the trial court's role in conducting a trial.

Third, defendant objects to a comment made by the trial court to plaintiff's counsel that he had not established the "vital matter" that the machine in question belonged to defendant. Defendant has failed to indicate how this comment prejudiced him. Therefore, we decline to further address this allegation.

Fourth, defendant contends that the trial court improperly advised plaintiff's counsel to use an itemized verdict so as to receive a larger verdict. During an instructions conference, the trial court asked defense counsel:

"Are you objecting to the fact that he [is] submitting a general verdict—the rules provide it should be itemized unless there are no objections on the part of defendant."

Later, during a subsequent instruction conference, the following dialogue ensued:

"THE COURT: I have one verdict form here for the Plaintiff. You left that out. You were going to give me one that itemizes. Do you have one that itemizes now? Give me a copy of that, will you?

[DEFENSE COUNSEL]: Can I show on the record that this jury instruction was given—.

THE COURT: That's what the rules provide.

[DEFENSE COUNSEL]: I know what the rules provide, but the Court is suggesting that we use this.

THE COURT: The Court is suggesting that we abide by the rules."

In our view, the aforementioned indicates nothing more than the trial court's efforts to be sure that correct procedures were followed. Further, there is no suggestion by the court that the plaintiff would be able to obtain a larger verdict if he had itemized.

■■ Regarding defendant's efforts to impeach plaintiff's testimony at trial, defendant argues that the trial court erroneously prevented defendant from impeaching plaintiff's testimony regarding what tasks he was able to perform since the accident and whether he had removed the screen guard from the machine at the time of the accident. In his brief, defendant fails to provide page citations in the

record to direct this court to defendant's efforts at impeachment and also fails to provide any further argument than a mere statement that the trial court had erred and a citation supporting the legal principle that "impeachment is not restricted alone to finding flat contradictions." As previously stated, it is not the function of this court to search the record to find grounds to reverse the trial court. Accordingly, the argument will not be considered. For the same reason, defendant's allegation that the trial court erred in allowing testimony as to plaintiff's earning capacity if he had not been injured, will not be considered. *Webb v. Angell* (1987), 155 Ill. App. 3d 848, 508 N.E.2d 508.

With respect to defendant's contention that the trial court erred in refusing to admit evidence as to lockout procedures ADM had available, defendant relies on *Pettigrew v. National Accounts System, Inc.* (1966), 67 Ill. App. 2d 344, 213 N.E.2d 778. However, *Pettigrew* addresses a constitutional due process issue regarding a covenant not to compete found in an employment contract and has no relevance to the case at bar. Accordingly, because defendant has once again failed to provide a citation to the record indicating the erroneous ruling or to provide relevant legal argument, we decline to further consider this issue. *Bass v. Washington-Kinney Co.* (1983), 119 Ill. App. 3d 713, 457 N.E.2d 85.

The remaining errors alleged by defendant, *i.e.*, plaintiff's alleged suggestion that defendant had to examine the machine; allowing Roscoe Warner to testify regarding another person's deposition and the trial court's refusal to allow defendant to cross-examine plaintiff as to his marital status, are void of legal argument and, thus, are mere contentions which do not merit consideration on review. *Falkner v. Hinckley Parachute Center, Inc.* (1989), 178 Ill. App. 3d 597, 533 N.E.2d 941.

For the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

O'CONNOR and MANNING, JJ., concur.