LYDIA CARRILLO *et al.*, Plaintiffs-Appellees, v. FORD MOTOR COMPANY, Defendant-Appellant (Kevin Gaczkowski, Defendant).

First District (3rd Division)   No. 1—00—2902

Opinion filed October 24, 2001.—Rehearing denied November 28, 2001.

956

Donohue Brown Mathewson & Smyth, of Chicago (John T. Coleman, Richard B. Foster, Mark H. Boyle, and Karen Kies DeGrand, of counsel), and Ford Motor Company, of Dearborn, Michigan (Robert W. Powell, of counsel), for appellant.

Bruce R. Pfaff & Associates, of Chicago (Bruce R. Pfaff, Michael T. Gill, and Michael W. Rathsack, of counsel), for appellees.

JUSTICE WOLFSON delivered the opinion of the court:

On the afternoon of December 14, 1993, Lydia Carrillo was stopped at a red light in Hammond, Indiana. She was in a 1991 Ford Explorer. A car being driven by Kevin Gaczkowski at about 60 miles per hour plowed into the rear of the Explorer. The force of the impact caused Lydia's seatback to flatten. She was thrown into the rear seat of the car, fracturing two vertebrae in her back. She is paralyzed from the chest down as a result of the injuries she sustained in the accident.

Lydia and her husband, Angelo, filed suit against the Ford Motor Company and Gaczkowski. Their product liability claim against Ford alleged that the design of the Explorer's seat was unreasonably dangerous. They alleged the seat was not strong enough to withstand the force of the collision, causing the seatback to collapse at impact, in turn causing Lydia's injuries. Their suit against Gaczkowski sounded

in negligence. He was held in default before trial. The jury returned a verdict against Ford. It awarded Lydia $14 million in damages. Angelo was awarded $500,000 in damages on his loss of consortium claim. The trial court entered judgment on the verdicts.

Ford raises several issues on appeal, including the trial court's rulings excluding some of Ford's evidence, but it aims its heaviest guns at a pattern jury instruction the court refused to give.

We affirm the trial court's judgment.

## FACTS

The three-week trial in this case included testimony from numerous lay and expert witnesses. Neither party disputes the facts surrounding the accident itself or the extent of Lydia's injuries. The heart of the dispute in this case is found in the expert testimony offered by each side. Ford's contentions did not focus on whether Lydia was injured to the extent she claimed or the facts of the accident itself—it disputed the theories offered by her experts, who said her injuries were caused by the unreasonably dangerous design of the Explorer seatback.

Plaintiffs' experts said the seatback design was unreasonably dangerous in rear-impact collisions in which a high rate of force acts on the seat as a result of the impact.

Dr. Joseph Burton, the first of plaintiffs' experts to testify, was the chief medical examiner for De Kalb County, Georgia. He was an accident reconstruction specialist. Dr. Burton testified that when Gaczkowski hit the Explorer, Lydia's car was pushed into the car in front of her. The right side of Lydia's car rotated and hit the back of another car. The cars Lydia hit were pushed into other cars in front of them. Lydia was driving the Explorer and her son, Anthony, was in the passenger seat. Both seats were in a reclined position after the accident. Lydia's body was stretched across her seat, and her feet were around the steering wheel or dash board. Anthony was found on the front floorboard. Lydia's and Anthony's seat belts were still buckled.

According to Dr. Burton, it would take somewhere between 1,000 and 2,000 pounds of compressive force to break the vertebrae that Lydia broke during the accident. Dr. Burton discussed the role that the reclined seatback played in causing Lydia's injuries. When her seatback reclined, Lydia was pushed up the seatback. Lydia's shoulder was driven into the rear seat, resulting in her injuries.

Dr. Burton identified this type of movement as "ramping." Seats can be designed to minimize or prevent "ramping." The contour of the seat could be changed, the seat could be made from a different material, the angle or inclination of the seat could be changed, and

restraints could be used to prevent this type of movement in rear-impact collisions. The force with which the Explorer was hit caused Lydia to have injuries that others might not have in similar, but less forceful, rear-impact accidents.

Dr. Burton described the goals of a seat and seatback in rear-impact collisions as "part of the safety package to protect the individual." Lydia's seat "did not do what the seat would be expected to do" to prevent her from sustaining an injury. The type of collision involved in this case was reasonably foreseeable.

Sterling Gee testified he worked for Visteon Automotive, a division of Ford. Gee was responsible, in part, for the design of the seatback in the Explorer model Lydia was driving at the time of the accident. Gee testified the seatback strength for that model Explorer was tested to make sure it complied with government standards. Ford's policy included testing it at a force 30% above what the government required. The seat was tested using a "static pull" test.

Gee testified the yielding seat design used in the Explorer was meant to absorb some of the force from an impact if an accident occurred. Gee said a rigid seat would transfer all of the energy of an impact to the occupant.

Robert Mezzadri testified he was a seat system technical specialist for Ford. He worked for Ford for 31 years. The majority of his work was in the area of seat design or seat system design. The seat that was in the 1991 Ford Explorer was a seat that was designed for the 1989 Ford Ranger. The "seat cushion pan" was the same in that design as it was in the design for the Ford Aerostar. The seatback strength for the Aerostar was similar to that of the Explorer. The differences between the two were primarily stylistic. Mezzadri discussed the design of the seat in detail. Mezzadri also was asked about the standard tests run on the Explorer seat. He said the seat had been tested up to a 400-pound load. This exceeded federal standards for performance.

Mezzadri testified it was possible to design a seat in 1991 that would deform less than the Explorer seat did in a rear-impact collision. He agreed that a seatback was part of the restraint system in a rear collision.

Dr. Kenneth Saczalski testified he had a doctorate in engineering mechanics. His work experience included research that allowed him to gain an understanding as to how humans respond to impact loads. He also had done a number of studies focused on injury tolerance levels. Dr. Saczalski prepared an accident reconstruction of the collision that resulted in Lydia's injuries.

Dr. Saczalski determined that when Lydia's Explorer was hit from the rear by Gaczkowski's car, the Explorer was shoved forward into

the car in front of it at about 30 miles per hour. According to Dr. Sac-zalski, Gaczkowski's car was moving at about 58 to 60 miles per hour when it hit the Explorer. About 20 g's of force were exerted on the Explorer in the collision. Based on tests carried out on a seat similar to the one that was in Lydia's Explorer, her seat could carry only about 7 g's of load force before it collapsed rearward. This means the seat collapsed before the Explorer had reached its top speed after the collision. Though Lydia was in a "normal seated position" before the impact occurred, once the seat collapsed after the impact, Lydia "was laying there exposed to any shoving or intrusion that would take place."

Dr. Saczalski said he also tested a Chrysler Sebring seat. That seat had an integrated seat belt. The 1991 Explorer seat belt was not integrated. The Sebring seat could withstand a higher force load than the Explorer seat. Based on the tests he performed, Dr. Saczalski felt Lydia would have been safe in a seat like the Sebring seat. There was nothing about the technology of the Chrysler seat that would not have made it feasible for the design of the 1991 Explorer.

Dr. Saczalski said Lydia's seat did not perform well. The Explorer seat was not safe because it lacked sufficient strength and height. The seat left Lydia "vulnerable in a very low load situation to a foreseeable crash event." Dr. Saczalski testified about a number of crash tests that exemplified this weakness in the Explorer seat. He described two tests he performed for other cases. Those tests showed the stronger seat performed better in accidents like Lydia's. He did not believe the federal standard for seat loads provided a sufficient level of safety. There were seat designs in existence at the time that Lydia's Explorer was being produced that would have protected Lydia. He identified a BMW seat, a Mercedes seat, and the Sebring seat.

Ford's experts told the jury that yielding seats, like the Explorer's, were reasonably safe. They said they believed yielding seats prevented injuries in the majority of accidents. They claimed accidents like Lydia's are rare; if they designed seats to perform safely in accidents like Lydia's, safety would be compromised in the majority of rear-impact collisions which occur at a lower rate of force.

Philip Majka testified he was an independent automotive consultant who does research on accidents. He was employed by Ford as a product development engineer for 30 years before he retired in 1998. Majka described how a seat was designed for Ford. Majka discussed the evolution of seat design. Majka said the 1991 Explorer seat was primarily based on the Escort seat. Some components also were used in the Aerostar and Ranger.

Majka discussed yielding and rigid seats. The Explorer seat was a

yielding seat. The advantage of a yielding seat is it absorbs some of the energy in an impact. He was aware of only two cars in production in 1991 that had a seat as stiff as Dr. Saczalski recommended. Ford seats generally are two to three times stiffer than the federal requirement.

Majka said he did not believe it would be safe to use a seat as stiff as Saczalski recommended because if the occupant were out of position in the seat, the seat could cause serious injuries. The stiffer seat would cause more "rebound" in its occupants in the case of a rear-impact collision. The yielding seat would provide the greatest benefits for the majority of people.

Andrew Levitt testified he was a research engineer with Collision Research & Analysis, Inc., in California. Collision Research analyzes automobile accidents. He discussed the evolution of seat design. Researchers found rigid seats have a tendency to store energy, which he identified as problematic. He believed the yielding seat performed well, particularly when coupled with a seat belt, and that there was a very low incidence of injury with those seats.

Levitt discussed the static pull test of the Explorer seat. The seat did not yield until it reached 800 pounds of force. Levitt said 99.9% of the vehicles on the road in 1991 had seats with the same strength range as the Explorer.

Carl Savage testified he was a consulting engineer who focused on vehicle crashworthiness. Savage described components of the Explorer seat. Statistically speaking, a person's chances of being in an accident as severe as Lydia's were very slim. Savage described how the Explorer seat would respond in a rear-impact collision. In order for the Explorer seat to have stayed upright in Lydia's accident, it would have had to have been "extremely stiff."

Doctor Priyanvanjan Prasad testified he was a safety engineer with Ford's advanced vehicle technology department. His department was responsible for advanced safety research and development. This group developed the acceptance criteria for safety tests and determined how components "should behave during a crash." His educational background and training included an emphasis on head and spinal injuries.

Dr. Prasad said he had conducted sled tests with stiffened, rigid and yielding seats. He ran those tests with crash test dummies in both normal positions and "out of position." He found the rigid seats and stiffer seats increased the "loading" in the neck of the dummies. This meant that an increase in seat rigidity would result in a higher number of whiplash injuries. He also found that the "shear forces" in the lumbar spine would increase with the more rigid seats. The more rigid

seats could result in a higher number of fractured vertebrae in the base of the neck. These injuries could occur at lower speeds, according to Dr. Prasad, and could therefore become more common in cars with more rigid seats.

The jury was shown a video of a sled test performed by Dr. Prasad that showed how a crash test dummy performed in a rigid seat when the dummy was out of the ideal sitting position. The test was run at 15 miles per hour. Dr. Prasad said that test showed that when the dummies were out of position, the loads on their necks were always higher in the more rigid seat. In rigid seats there is a danger of "rebounding" in rear-impact collisions so that the occupant could spring forward and hit the roof, the steering system, or the instrument panel. A yielding seat like the Explorer's protects against these injuries by absorbing energy. Dr. Prasad also discussed a video showing a sled test with a yielding seat. In severe rear-impact collisions, a seat like the Explorer's would yield. The incidence of rear impact fatality is very low in cars with seats like the Explorer's. He believed the Explorer seat was reasonably safe.

Ford rested after Dr. Prasad testified. However, as an offer of proof Ford called Roger Burnett to testify to a sled test that the court would not allow in evidence. Burnett was a design analysis engineer for Ford. Burnett testified he conducted a sled test with a Sebring driver seat in an Explorer body. The sled test was done after Ford carried out the crash test for this case.

Burnett said they used a crash test dummy in the test that was as close to Lydia's height and weight as possible. The Sebring seat was strengthened so that it was stronger than it normally would be. Burnett said the neck loads experienced by the dummy exceeded the "injury criteria."

Ford completed the offer of proof by saying it would have called Dr. Harry Smith as a witness. Dr. Smith would have testified he reviewed the results of the sled test discussed by Burnett. Dr. Smith would have said using a seat like the Sebring seat would cause neck injuries to an occupant in a collision like the one in this case.

At Ford's request, the court submitted a special interrogatory to the jury: "Was the seat design on the 1991 Explorer unreasonably dangerous?" During deliberations, the jury sent out a question: was it to consider whether all 1991 Explorers had an unreasonably dangerous condition or was it to consider only whether Lydia's Explorer was unreasonably dangerous? The court answered the question by saying the jury had received its instructions and to continue to deliberate.

The jury decided in plaintiffs' favor. In answer to the special interrogatory, it said the seat design was unreasonably dangerous. The jury

awarded Lydia $14 million and found Ford was 30% liable and Gaczkowski was 70% liable. After some confusion about its verdicts, the jury found for Angelo and against Ford. It awarded Angelo $500,000 in damages and found Ford 30% liable and Gaczkowski 70% liable.

Ford filed a posttrial motion, which the trial court denied.

## DECISION

### Jury Instructions

### IPI Civil No. 400.07

■ Ford contends the jury did not receive adequate instructions on the issue of defective design. It does not complain about the instructions that were given. It claims the trial court's refusal to give the jury Illinois Pattern Jury Instruction, Civil, No. 400.07 (2000 ed.) (hereinafter IPI Civil No. 400.07) imposed on Ford an incorrect standard of absolute safety, thus making the instructions that were given incomplete and misleading.

The jury received Illinois Pattern Jury Instructions, Civil, Nos. 400.01 and 400.06 (2000 ed.) (hereinafter IPI Civil (2000) Nos. 400.01 and 400.06). That is:

> "In their complaint against Ford Motor Company, the plaintiffs claim Lydia Carillo [sic] was injured when using the 1991 Explorer vehicle and that there existed in the vehicle at the time it left the control of defendant *** a condition which made the vehicle unreasonably dangerous in the following respect: The driver's seat was designed with inadequate strength.
> * * *
> Under Count I plaintiffs have the burden of proving each of the following propositions:
>> First, that the condition claimed by the plaintiffs as stated to you in these instructions existed in the vehicle.
>> Second, that the condition made the vehicle unreasonably dangerous.
>> Third, that the condition existed at the time the vehicle left the control of the defendant.
>> Fourth, that the plaintiffs were injured.
>> Fifth, that the condition of the vehicle was a proximate cause of plaintiffs' injuries.
> * * *
> When I use the expression 'unreasonably dangerous' I mean unsafe when put to a use that is reasonably foreseeable considering the nature and function of the vehicle."

See IPI Civil (2000) Nos. 400.01, 400.06.

The trial court refused Ford's request to tell the jury: "It is the

duty of an automobile manufacturer to furnish a product which is in a reasonably safe condition when put to a use that was reasonably foreseeable considering its nature and intended function." IPI Civil (2000) No. 400.07.

Ford's primary complaint is that the "unreasonably dangerous" definition given to the jury, standing alone, does not explain that the design must be only "reasonably safe," not absolutely safe, since Ford did not have a duty to design a product incapable of causing an injury. Much of Ford's expert testimony was aimed at persuading the jury that yielding seats, like those in the Explorer, prevented injury in most accidents, and that adopting the design urged by plaintiffs' experts would compromise safety in the majority of rear-impact collisions, which occur at a lower rate of force.

Ford points to the jury's question—should it consider whether all Ford Explorers were unreasonably dangerous or consider only whether Lydia's Explorer was unreasonably dangerous—as evidence of confusion.

We do not find support for Ford's position in the reported Illinois decisions or in the comments to IPI Civil (2000) Nos. 400.01 and 400.06.

*Suvada v. White Motor Co.*, 32 Ill. 2d 612, 210 N.E.2d 182 (1965), brought strict liability theory to Illinois tort law. *Suvada* relied heavily on section 402A of the Restatement (Second) of Torts (1965). *Suvada*, 32 Ill. 2d at 621-22. The phrase "unreasonably dangerous" came from section 402A, was adopted in *Suvada*, and has appeared in our reported decisions ever since. See *Lamkin v. Towner*, 138 Ill. 2d 510, 528, 563 N.E.2d 449 (1990).

Some writers have suggested the term "not reasonably safe" would be preferable to "unreasonably dangerous," but our supreme court has not adopted that suggestion. See *Dunham v. Vaughan & Bushnell Manufacturing Co.*, 42 Ill. 2d 339, 343, 247 N.E.2d 401 (1969). In *Dunham*, the court approved Dean Prosser's statement that " 'the product is to be regarded as defective if it is *not safe* for such a use that can be expected to be made of it.' [Citation.]" (Emphasis added.) *Dunham*, 42 Ill. 2d at 343.

In *Rios v. Niagra Machine & Tool Works*, 59 Ill. 2d 79, 83, 319 N.E.2d 232 (1974), the court found no difference between "unreasonably dangerous" and "not reasonably safe":

> "However, to establish liability in strict tort it is not sufficient that the plaintiff prove the product was dangerous; he must prove that it was unreasonably dangerous, or in other words not reasonably safe." *Rios*, 59 Ill. 2d at 83.

The pattern instructions reject "not reasonably safe":

> "However, the Restatement, and *Suvada*, and all its progeny,

furnish persuasive authority that the jury should be instructed that it is the 'unreasonably dangerous' condition of the product which leads to liability." IPI Civil (2000) No. 400.01, Comment, at 607.

IPI Civil No. 400.06 adopts Dean Prosser's "not safe" formulation by using the word "unsafe." It is used "to express the concepts of 'dangerous' and 'defective' used in the *Dunham* definition." IPI Civil (2000) No. 400.06, Comment, at 620.

We have found no Illinois decision that requires IPI Civil (2000) No. 400.07 be given to juries in design defect cases. Nor do we see how giving IPI Civil (2000) No. 400.07 would address Ford's concern that the jury focused only on Lydia's seatback, not on all the other Explorer seatbacks. No witness, plaintiff or defense, suggested such an approach. All of the testimony dealt with the design of all Explorer seatbacks. We believe using "unreasonably dangerous" and "unsafe" in one instruction and "reasonably safe condition" in another would invite juror confusion. Instructions should be "sufficiently clear to avoid misleading the jury, while fairly and correctly stating the law." *Baier v. Bostitch*, 243 Ill. App. 3d 195, 207, 611 N.E.2d 1103 (1993).

We decline to speculate on why the jury sent out the question it did. We do note the plaintiff presented evidence of two other similar occurrence collisions, each causing severe injury to the witnesses who testified to those events.

We have another problem with IPI Civil (2000) No. 400.07 in this setting. It uses the word "duty." We have suggested the word should be avoided in strict liability instructions because it "may tend to blur the distinction between negligence and strict liability in tort." *Lundy v. Whiting Corp.*, 93 Ill. App. 3d 244, 253, 417 N.E.2d 154 (1981).

There is no comment to IPI Civil (2000) No. 400.07. The notes on use give little guidance to the question of when it should be used. We note the bracketed portions of the instruction apply only to duty-to-warn cases, where plaintiffs are required to plead and prove the manufacturer knew or should have known of the danger that caused the injury. *Woodill v. Parke Davis & Co.*, 79 Ill. 2d 26, 35, 402 N.E.2d 194 (1980). IPI Civil (2000) No. 400.07 is the only failure-to-warn instruction in the products liability section of the pattern jury instructions. We do not believe it is intended to apply to defective design cases.

Ford should not be held to a standard of absolute safety. It does not have to design a product that is totally incapable of causing injury, but "it must design the product so that the user is not subject to an unreasonable risk of harm." *Baier*, 243 Ill. App. 3d at 203.

IPI Civil (2000) No. 400.06 told the jury a product is unreasonably dangerous only when put to a use that is reasonably foreseeable. See

*Winnett v. Winnett*, 57 Ill. 2d 7, 11, 310 N.E.2d 1 (1974). Ford was free to argue and did argue that Lydia's accident was of a rare type. Both sides presented lengthy and conflicting testimony from a long list of experts. The jury made its decision.

We conclude the instructions given the jury in this case "fully, fairly and comprehensively informed the jury of the relevant legal principles." *Carey v. Lazzara, Inc.*, 277 Ill. App. 3d 902, 906, 661 N.E.2d 413 (1996). The trial court did not abuse its discretion when it refused to give IPI Civil (2000) No. 400.07.

## IPI Civil (2000) No. 600.02

■ Ford also contends the trial court erred in refusing to tender a jury instruction on allocation of fault. Ford submitted a modified version of Illinois Pattern Jury Instructions, Civil, No. 600.02 (2000 ed.), which took into account the finding of negligence against Gaczkowski.

It would not have been error for the trial court to instruct the jury in the manner Ford requested, but its failure to do so is not an abuse of discretion. The instructions given to the jury adequately outlined the procedure for apportioning fault to the two defendants.

## Trial Court's Exclusion of Evidence

Ford contends the trial court erred in excluding the following evidence: (1) accident and injury statistics derived from a government database; (2) the sled test Roger Burnett discussed, where Ford used a stiffer Sebring seat in an Explorer body to show Lydia would have been likely to suffer injury even if the seat had been more rigid; and (3) evidence that Gaczkowski was under the influence of illegal drugs at the time of the accident. The trial court granted plaintiffs' pretrial motion *in limine* which sought to bar this evidence.

■ The trial court's determination of admissibility of evidence lies within its sound discretion. *First Midwest Trust Co. v. Rogers*, 296 Ill. App. 3d 416, 426, 701 N.E.2d 1107 (1998). A reviewing court will not reverse the trial court's decision absent an abuse of that discretion. *First Midwest*, 296 Ill. App. 3d at 426.

■ Ford sought to enter statistics from a national database showing the number of injuries suffered in rear impacts involving vehicles using a yielding seat design similar to the 1991 Ford Explorer. While the statistics themselves were not admitted into evidence, Ford was allowed to ask its experts whether they relied on the statistics. Ford's experts repeatedly testified to what it claims those statistics showed—that the overall number of injuries in rear-impact collisions involving yielding seats is low. While the jury did not see the actual statistics, it heard testimony about them several times. We do not find that the trial court's refusal to admit the statistics into evidence was an abuse of discretion.

■ Nor do we find the trial court erred in refusing to allow the evidence concerning the sled test. The admissibility of this type of experiment is dependent upon whether the conditions of the experiment were substantially similar to the actual circumstances of the accident. *First Midwest*, 296 Ill. App. 3d at 426. In this case, while defendant's experts claimed the conditions of the experiment were similar, plaintiffs' experts claimed they were not. Plaintiffs' experts said the crash pulse and timing of the sled test differed from the actual accident, while defendant's experts said they were substantially similar. Given these conflicting claims, we do not find the trial court committed an abuse of discretion in refusing to admit the sled test.

Ford contends the trial court's ruling was inconsistent with its decision to allow plaintiffs to present testimony concerning other accidents. Over defense counsel's objections, plaintiffs presented testimony from two women who had injuries similar to Lydia's as a result of rear-impact collisions. Deborah Newman testified she was driving a Ford Aerostar in May 1993 when she was hit from the rear while stopped behind a car waiting to make a left turn. Newman's seat also collapsed and she was thrown into the rear floorboard. Newman lost the use of her legs as a result of the accident.

Sandy Hensler was driving a 1987 Ford Aerostar in June 1997 when she was rear-ended while she was stopped waiting to make a turn. Hensler was not wearing her seat belt because she had a shoulder injury. Her seat reclined during the impact. Hensler has limited use of her arms and legs as a result of the injuries she sustained in that accident.

According to Ford, plaintiffs' failure to show that the crash pulses were the same in the Hensler and Newman accidents should have precluded their admission. Ford says this evidence was "emotionally charged" and served only to inflame the jury. We do not agree.

This was not a reenactment of the accident. Whether the crash pulse was the same in the Newman and Hensler accidents does not have the same implications it would for a sled test that purportedly shows what Lydia's injuries would have been had she been sitting in a different seat.

No one contends the Hensler and Newman accidents occurred at a faster speed with a higher force or crash pulse than Lydia's accident. The parties appear to acknowledge that Lydia's accident was more severe because of the speed with which Gaczkowski hit her. However, in both the Newman and Hensler accidents the drivers were hit from behind and were sitting in seats that the experts concede were similar to the seat Lydia was sitting in. In both accidents, the seats yielded completely and the occupants suffered injuries similar to Lydia's. We

do not find the trial court's admission of these accidents was error. See *Gowler v. Ferrell-Ross Co.*, 206 Ill. App. 3d 194, 202, 563 N.E.2d 773 (1990) (other accidents need not be identical to accident at issue).

■ Finally, Ford contends the trial court erred in refusing to admit evidence of Gaczkowski's drug impairment. Outside the presence of the jury, the trial court allowed Stevens to testify that Gaczkowski appeared to be under the influence of drugs or alcohol when he interviewed him. Stevens said he asked the hospital to do a blood test on Gaczkowski to screen for drugs and alcohol. The screen was positive for cocaine and PCP. As a result of the test, Gaczkowski was charged with driving a motor vehicle while under the influence of a controlled substance. Ford claims the jury should have been allowed to consider this testimony.

This evidence had no relevance to the only question at issue in this trial—whether the Ford Explorer seat was unreasonably dangerous. Gaczkowski's negligence was not at issue during the trial—the parties conceded his negligence. Evidence showing Gaczkowski was driving under the influence would have no bearing on the question of whether Ford's design of the Explorer seat was unreasonably dangerous. See *Wade v. City of Chicago Heights*, 295 Ill. App. 3d 873, 886, 693 N.E.2d 426 (1998) (evidence of intoxication relevant to show driver's negligence).

### Special Interrogatory

Ford contends the trial court erred in refusing to submit the following special interrogatory to the jury:

"Was the negligence of Kevin Gaczkowski the sole proximate cause of the injuries to Lydia Carillo [*sic*]?"

The record shows Ford submitted three interrogatories for approval:

"(1) Was the seatback design on the 1991 Explorer unreasonably dangerous?

(2) Did the seatback design on the 1991 Explorer proximately cause the injuries to Lydia Carillo [*sic*]?

(3) Was the negligence of Kevin Gaczkowski the sole proximate cause of the injuries to Lydia Carillo [*sic*]?"

The trial court approved the first and second interrogatories, with the understanding that the second would be changed to read "Was the seatback design on the 1991 Explorer a proximate cause of the injuries to Lydia Carillo [*sic*]?" The trial court did not approve the third.

Ford chose to use only the first interrogatory, withdrawing the second.

■ Under section 2—1108 of the Code of Civil Procedure, a party may submit a special interrogatory to the jury. 735 ILCS 5/2—1108

(West 1998). "When a special interrogatory is in proper form and relates to a material issue of ultimate fact, the trial court must submit it to the jury." *Santos v. Chicago Transit Authority*, 198 Ill. App. 3d 866, 869-70, 556 N.E.2d 607 (1990).

A special interrogatory should not be repetitive, misleading, confusing, or ambiguous. *Snyder v. Curran Township*, 281 Ill. App. 3d 56, 59, 666 N.E.2d 818 (1996). Because Gaczkowski's negligence was not at issue, the jury was required to make only one proximate cause finding—whether the alleged design defect in the Explorer seat was a proximate cause of Lydia's injuries. The trial court approved a special interrogatory that would have served as a check on the jury's proximate cause finding—it ruled Ford could ask the jury whether the seatback design of the Explorer was a proximate cause of Lydia's injuries.

■ To submit the third interrogatory, which asked whether Gaczkowski was the "sole proximate" cause of the injuries, would have been repetitive and could have confused the jury. Instead of each of the interrogatories serving as a check on the jury's general verdict (*Santos*, 198 Ill. App. 3d at 869), the third interrogatory would have served as a check on the second. This is not a recognized purpose of an interrogatory and would not have been appropriate. We find the trial court's refusal of the third interrogatory was not in error.

## CONCLUSION

For the reasons discussed above, we affirm the judgment of the trial court.

Affirmed.

CERDA and SOUTH, JJ., concur.